**WESTERBEKE CORPORATION,**
**Plaintiff,**

v.

**DAIHATSU MOTOR CO.,**
**LTD, Defendants.**

**No. 00 Civ. 8678(VM).**

United States District Court,
S.D. New York.

Sept. 26, 2001.

Notice of Removal.

---

1. Certain other objections to remand were, as Dublin concedes, cured by Jam's Amended

J. todd Hahn, Goodwin Procter LLP, New York City, for plaintiff.

Jay G. Safer, LeBoeuf, Lamb, Greene & MacRae, L.L.P., New York City, Allen C.B. Horsley, LeBoeuf, Lamb, Greene & MacRae, L.L.P., Boston, MA, for defendant.

### DECISION AND ORDER

MARRERO, District Judge.

In October 1997, Plaintiff Westerbeke Corporation (hereinafter "Westerbeke") initiated arbitration proceedings for breach of contract against Daihatsu Motor Co., Ltd. (hereinafter "Daihatsu") with the American Arbitration Association, Case No. 13 T 153 011057 97. On November 6, 2000, Ira G. Greenberg, Esq. (hereinafter

the "Arbitrator" or the "Tribunal"), sitting as the sole member of the panel, issued a Final Award in favor of Westerbeke in the amount of $4,202,255.00. Westerbeke filed an action to confirm the arbitration award in this Court, and Daihatsu has moved to vacate the same.

## I. BACKGROUND

### A. THE PARTIES AND THE COMPONENT SALES AGREEMENT

Westerbeke is a Delaware corporation with its principal place of business in Taunton, MA. (Compl.¶ 1). Westerbeke engages in the production and marketing of generators, marine generators and marine propulsion engines. A large part of its business consists of purchasing "carcass" engines from other manufacturers and "marinizing" them for resale. Marinization consists of modifying carcass engines in order to make them suitable for operation in marine environments. (Affidavit of John H. Westerbeke, Jr., sworn to June 5, 1998 (hereinafter "Westerbeke Affidavit"), at ¶ 7). Westerbeke's marine products are sold through a distribution network and also directly to builders of boats. (Id. at ¶ 8).

Daihatsu is a subsidiary of the Toyota Motor Company organized under the laws of Japan, with its principal operations in Osaka, Japan. Daihatsu manufactures engines and engine components. (Daihatsu Motor Co. Ltd.'s Memorandum of Law in Support of its Motion to Vacate the Arbitration Award, dated Feb. 5, 2001 (hereinafter "Daihatsu Memorandum"), at 2).

In 1983, the parties commenced negotiations on a long-term sales agreement for the purchase by Westerbeke of Daihatsu's gasoline-powered carcass engines for eventual marinization and incorporation into Westerbeke's product line. (Westerbeke Affidavit, at ¶ 10). Like many other long-term transnational business ventures, the parties entered into complex and protracted negotiations on the proposed form and substance of the contractual relationship. The negotiations involved balancing the competing interests and priorities of the parties and memorializing their compromises in the form of a workable agreement.

Westerbeke was primarily concerned with present and future exclusivity. According to Westerbeke, the company expends substantial sums to marinize and then promote a line of engines. (Westerbeke Affidavit, at ¶ 16). Its efforts could easily be undermined if the manufacturer of carcass engines routes its sales to another distributor piggybacking off the efforts already made by Westerbeke. (Id. at ¶¶ 16, 30). Furthermore, manufacturers of engines continually discontinue old models and replace them with new ones. Naturally, continued access to the new product lines is critical to the viability of a long-term relationship, and Westerbeke sought to ensure a prospective approach to its agreement with Daihatsu. (Id.).

Daihatsu, on the other hand, was naturally averse to long-term exclusivity. As a manufacturer, Daihatsu's interests lie in preserving its freedom to sell its engines and components in the most efficient and advantageous distribution channels. (See Interlocutory Award, at 6). A long-term exclusive purchaser who fails to maintain minimum purchase quantities or neglects to market aggressively not only ensures its own failure, but also that of the component maker. In short, Daihatsu's concern was being tied to a "poor choice" for a distribution partner. (Id.)

Ultimately, the parties balanced their competing interests and reached a compromise that culminated in the Component Sales Agreement (hereinafter the "CSA")

entered into on May 1, 1985.[1] The CSA provided for the present exclusivity that Westerbeke sought. For a period of six years, Daihatsu agreed to supply Westerbeke with certain contractually-defined engines on an exclusive basis in the United States and Canada. (*See* CSA, Article 4.1). The CSA also contained an automatic renewal provision for successive two-year terms, and it appears from the record that the CSA was renewed twice for an additional four years. (*See* CSA, Article 14.1).

With respect to Daihatsu's future engine models, however, exclusivity was not automatic. Article 3.2 of the CSA required that Daihatsu respect Westerbeke's right of first refusal during the first six months that Daihatsu wished to sell other "Engines," as defined by the CSA. The exclusivity provision of the CSA would only apply to the new engine if, during the six month term, Westerbeke and Daihatsu reached agreement on the material terms of sale for the new engines—"specifications, prices, minimum purchase quantities, delivery terms, etc.". (*See* CSA, Article 3.2).

## B. *DAIHATSU'S NEW E–070 ENGINE*

In the early 1990s, Daihatsu was actively developing, and perhaps marketing, a new product line, the E–070 Engine. The new model was a water-cooled, three-cylinder gasoline engine. (Westerbeke Affidavit, at ¶ 64). After a thorough review of the record, the Arbitrator found that the E–070 Engine was of the type that triggered Article 3 .2 of the CSA, a finding of fact

which was not clearly erroneous. (Interlocutory Award, *Westerbeke Corporation v. Daihatsu Motor Co. Ltd.*, AAA Case No. 13 T 153 01057 97, at 18 (Mar. 8, 1999) (hereinafter "Interlocutory Award")). Initially, it also appears that Daihatsu did not bring this new model to the attention of Westerbeke.

The parties are at odds as to why the E–070 Engine never became an "Engine" as defined by the CSA, subject to Westerbeke's right of exclusivity. Daihatsu contends that the E–070 Engine was never intended to be a marine product, a point which was contradicted to some extent by documents produced in the proceedings below. (*See* Daihatsu Memorandum, at 4–5; Interlocutory Award, at 4–7). Daihatsu also explains that its decision not to pursue sales of the E–070 to Westerbeke was motivated by its growing dissatisfaction with Westerbeke's sales volume. (*See* Daihatsu Memorandum, at 2; Westerbeke Affidavit, at ¶ 66). Daihatsu's dissatisfaction was manifested in threats to terminate the exclusivity provisions of the CSA at least as early as 1990. (*See id.*).

Westerbeke believes that Daihatsu's unwillingness to negotiate with respect to the E–070 Engine had nothing to do with either the target markets for the new model or the level of Westerbeke's purchases. Rather, Westerbeke contends that Daihatsu was secretly developing the E–070 Engine and negotiating with another North American distributor, the Briggs & Stratton Corporation (hereinafter "Briggs"), for exclusive rights to the new engine.[2] (*See*

---

1. The CSA is attached as Exhibit B to the Complaint to Confirm Arbitration Award, dated Nov. 13, 2000.

2. Mr. Westerbeke further avers that, "[w]hile these threats were purportedly based upon the volume of Westerbeke's sales, I now believe that Daihatsu threatened to terminate Westerbeke's rights of exclusivity and first

refusal because Daihatsu recognized that those rights were being violated by Daihatsu's secret development and marketing of the E–070 Engine to Briggs & Stratton." (Westerbeke Affidavit, at ¶ 66).

To some extent, Westerbeke misses the point. While it is true that Daihatsu's threats of termination may have been motivated in

Westerbeke Corporation's Opposition to Motion to Vacate Arbitration Award and Memorandum in Support of Motion to Confirm Award, dated Feb. 20, 2001 (hereinafter "Westerbeke Memorandum"), at 3).

Around June 1993, Briggs issued a press release announcing a joint venture between it and Daihatsu for the purpose of marketing, selling, and servicing a new line of water-cooled engines in North America. (Westerbeke Affidavit, at ¶ 77). Later that Summer, trade publications ran advertisements of the E–070 Engine which came to the attention of Westerbeke's President and Chief Executive Officer. (*Id.* at ¶ 78). This was the first time that Westerbeke had learned of Daihatsu's new engine. (*Id.*).

In the ensuing months, representatives of Westerbeke contacted Daihatsu to communicate its belief that Daihatsu had breached the CSA. (*Id.* at ¶¶ 79–83). It appears from the record that the parties attempted to salvage some sort of working relationship, but those efforts never came to fruition. In October 1994, Daihatsu terminated the CSA by providing Westerbeke six months notice. (Daihatsu Memorandum, at 2).

## C. *THE ENSUING ARBITRATION AND THE PRESENT PROCEEDINGS*

The demise of the parties' working relationship resulted in several legal proceedings. In February 1997, Westerbeke filed an action in Norfolk Superior Court and a subsequent action in the United States District Court for the District of Massachusetts in March 1997. Westerbeke filed a separate action against

Briggs for its role in the dispute between the parties. All of these actions were voluntarily dismissed or stayed when Westerbeke invoked Article 23 of the CSA, which requires all disputes to be resolved by arbitration pursuant to the Japan–American Trade Arbitration Agreement of September 16, 1952. Article 23 also stipulates New York as the situs of arbitration.

Accordingly, Westerbeke filed a claim with the American Arbitration Association in October 1997. The Arbitrator bifurcated proceedings into separate phases for liability and damages. (*See* Interlocutory Award, at 1). At the close of the liability phase, the Arbitrator issued an Interlocutory Award which stated: "[t]he primary issue for decision is whether respondent Daihatsu Motor Company, Limited violated the contractual rights of claimant Westerbeke Corporation in *refusing to negotiate for the inclusion* of the E–070 engines as Engines within the meaning of the 1985 Component Sales Agreement between the two parties. The Tribunal holds that it did." (*Id.* (emphasis supplied)).

Notwithstanding this clear and unambiguous basis for liability enunciated in the Interlocutory Award, the Tribunal effectively replaced its liability analysis in the Final Award of damages: "[t]he appropriate analytical framework is that of a contract with condition precedent to the addition of a new Engine." (Final Award, *Westerbeke Corporation v. Daihatsu Motor Co. Ltd.,* AAA Case No. 13 T 153 01057 97, at 6 (Nov. 6, 2000) (hereinafter "Final Award")). The Arbitrator awarded Westerbeke over $4 million in damages, which included damages for lost profits that

part by its surreptitious negotiations with Briggs, those negotiations may never have ensued had Daihatsu been largely satisfied Westerbeke's sales volume. In other words, whatever third-party dealings Daihatsu was

engaged in, the reasons behind them may well have been dissatisfaction with Westerbeke's orders or a primary desire to market the new engine in a non-marine environment.

Westerbeke expected from hypothetical sales of the E–070 Engines.

Westerbeke now moves to confirm the award as Daihatsu has refused to recognize it. Westerbeke contends that the Tribunal's decision was proper in all respects and that Daihatsu has not advanced sufficient grounds to interfere with the Arbitrator's award. In any event, Westerbeke avers that Daihatsu should be precluded from judgment because it has not met its burden of production, which Westerbeke believes to require production of the complete record in the arbitration proceedings below.[3]

For its part, Daihatsu moves to vacate the award on four principal grounds: (1) the Arbitrator manifestly disregarded controlling New York law on the award of expectancy damages for breach of a duty to negotiate; (2) pursuant to § 10(a)(4) of the Federal Arbitration Act,[4] the Tribunal exceeded the scope of its authority as set forth in the CSA; (3) the Arbitrator manifestly disregarded the record and the terms of the CSA; and (4) by finding a contract with a condition precedent in the Final Award after having determined in the Interlocutory Award that liability was based on a failure to negotiate, the Tribunal violated the doctrine of the "law of the case."

## II. *STANDARD OF REVIEW OF AN ARBITRATION AWARD*

It is beyond dispute that an arbitration award is entitled to substantial deference and that a district court's review is narrowly circumscribed. *See Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.,* 126 F.3d 15, 23 (2d Cir.1997) (citations omitted), *cert. denied,* 522 U.S. 1111, 118 S.Ct. 1042, 140 L.Ed.2d 107 (1998). As the Second Circuit has stated, "[a]n arbitrator's decision is entitled to substantial deference, and the arbitrator need only explicate his reasoning under the contract 'in terms that offer even a barely colorable justification for the outcome reached' in order to withstand judicial scrutiny." *In re Marine Pollution Serv., Inc.,* 857 F.2d 91, 94 (2d Cir.1988) (quoting *Matter of Andros Compania Maritima, S.A. of Kissavos (Marc Rich & Co., A.G.),* 579 F.2d 691, 704 (2d Cir.1978)). The Second Circuit has also characterized a district court's review of an arbitration award as a "summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Toys "R" Us,* 126 F.3d at 23 (citations omitted). The deference accorded to arbitration awards is particularly high in contract cases, where courts are generally reluctant to second guess an arbitrator's resolution of the parties' dispute. *Id.*

Informing the high standard of deference accorded to arbitration awards are the judicially-recognized advantages of arbitration as an alternative to litigation. One of those advantages is "a speedier, more economical and more effective enforcement of rights by way of arbitration than can be had by the tortuous course of

---

**3.** Westerbeke claims that by failing to produce the entire record of the proceedings below, Daihatsu has not met its burden of production and its motion to vacate the award should be denied. The case that it cites in support of that proposition compels no such result. *Green v. Progressive Asset Management, Inc.,* No. 00 Civ. 2539(DLC), 2000 WL 1229755 (S.D.N.Y. Aug.29, 2000). *Green* stands for the proposition that a party seeking to vacate an arbitration award must produce a record from the proceedings below that is *"sufficiently complete"* for the court to make an informed judgment. *Id.,* at *3 (citing *Lew Lieberbaum & Co., Inc. v. Randle,* 85 F.Supp.2d 123, 126 (E.D.N.Y.2000)). That standard has been met here.

**4.** Federal Arbitration Act, 9 U.S.C. § 10(a)(4) (hereinafter "FAA").

litigation, especially in the City of New York." *Wilko v. Swan*, 346 U.S. 427, 439–40, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (Frankfurter, J., *dissenting* ), *overruled on other grounds, Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989); *see also Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir.1993) ("[a]rbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation.") (citations omitted).

Although the deference to which arbitration awards are entitled is substantial, the FAA itself and the common law in this Circuit do not perfunctorily insulate those awards from review. Section 10(a) of the FAA enumerates grounds for vacating arbitration awards in the event of fraud, corruption, procedural misconduct or abuse of powers.

Apart from the relevant provisions of the FAA, the Second Circuit has recognized an alternative ground for vacatur of an arbitration award when that award is made in "manifest disregard of the law." Manifest disregard of the law is a "judicially-created ground for vacating [an] arbitration award, which was introduced by the Supreme Court in *Wilko v. Swan* .... It is not to be found in the federal arbitration law." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker*, 808 F.2d 930, 933 (2d Cir.1986). As the court explains, manifest disregard of the law is more than misunderstanding or error in the application of the law:

[t]he error must have been obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator. Moreover, the term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.

*Id.* (citations omitted); *see also Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 202 (2d Cir.1998), *cert. denied*, 526 U.S. 1034, 119 S.Ct. 1286, 143 L.Ed.2d 378 (1999); *Greenberg v. Bear Stearns & Co., Inc.*, No. 99 Civ. 358(JSM), 1999 WL 642859, at *1 (S.D.N.Y.1999), *aff'd*, 220 F.3d 22 (2d Cir. 2000), *cert. denied*, 531 U.S. 1075, 121 S.Ct. 770, 148 L.Ed.2d 669 (2001).

Therefore, when reviewing an award for manifest disregard of the law, the relevant inquiry is "extremely limited," and even more narrowly circumscribed than the threshold standard for reviewing arbitration awards. *Merrill Lynch*, 808 F.2d at 934. In order to vacate an award on the ground of manifest disregard of the law, a court must find both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit and clearly applicable to the case. *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 821 (2d Cir.1997) (quotations and citations omitted), *cert. denied*, 522 U.S. 1049, 118 S.Ct. 695, 139 L.Ed.2d 639 (1998).

Despite the rigid confines of its review, the Court holds that the Arbitrator's award of expected profits in favor of Westerbeke was one of those "extremely limited" instances when the Tribunal manifestly disregarded the controlling law.[5]

---

5. Because the Court's ruling on the dispositive issue of manifest disregard of the law compels vacatur, the Court need not address Daihatsu's alternative grounds for vacating the award, namely, that the Arbitrator exceeded his authority pursuant to FAA § 10(a)(4), that he manifestly disregarded the record and the CSA, and that he violated the doctrine of the law of the case.

## III. *DISCUSSION*

### A. *THE RIGHTS AND OBLIGATIONS IN ARTICLE 3.2 OF THE CSA*

■ When Daihatsu began developing the E–070 Engine and contemplating the best mode of distribution of its new product in North America, the circumstances triggered a test of the parties' CSA. The operative provision of the CSA was Article 3.2 which laid out the parties' rights and obligations in the event that a new "Engine," capable of being marinized, was introduced for North American distribution. In pertinent part, Article 3.2 of the CSA states:

> When DAIHATSU desires to sell in the Territory other water-cooled gasoline engines of fewer than four cylinders for the Products than the Engines[,] WESTERBEKE shall have the first refusal during the first six months after the date of DAIHATSU's first offer of the Estimate for the said engines. During the said six months of the first refusal for WESTERBEKE, DAIHATSU shall not offer the said engines to any third party in the Territory and if DAIHATSU/NM and WESTERBEKE come to an agreement on the specifications, prices, minimum purchase quantities, delivery terms, etc. of the said engines, such engines shall be added to the Engines as defined by the paragraph 1 of the Article 2 of this agreement.

Both parties and the Arbitrator recognized that Article 3.2 is ambiguous on its face. Thus, the Tribunal was thrust, as this Court is now, into the precarious position of interpreting an ambiguous contract provision while giving effect to the parties' intentions as manifested in the agreement itself and in supporting documents.

In framing the award, the Tribunal resolved a number of ambiguities, many of which the Court endorses. For instance, the Arbitrator interpreted the phrase "for the products" as "*suitable* for the products." (*See* Interlocutory Award, at 5) (emphasis supplied). This interpretation effectively balanced Westerbeke's concerns for exclusivity and its ability to recoup its investment against Daihatsu's fear of making sure that it was dealing with the right distributor. Under the Arbitrator's reading, if Daihatsu endeavored to sell in North America a new engine that was "suitable for" marine environments, then the right of first refusal would be triggered. Daihatsu's concerns would be addressed by the need to agree on the material terms of "specifications, prices, minimum purchase quantities, [and] delivery terms," before expanding the parties' agreement to include the new engine.

Therefore, when the E–070 Engine was ready for distribution in North America, the plain language of Article 3.2 granted Westerbeke a right of first refusal for six months, during which time Daihatsu was prohibited from offering the E–070 to another distributor. In the Court's view, there is no question that Daihatsu violated Westerbeke's contractual rights when it entered into an exclusive joint venture with Briggs for the distribution of the E–070 Engine. The critical inquiry, however, is what specific legal rights Westerbeke acquired by operation of Article 3.2 because the right to damages is based on the classification of those legal rights.

The answer to that question lies primarily in the text of Article 3.2 itself. By its terms, Westerbeke's right to future exclusivity with respect to the E–070 Engine was contingent upon agreement on the material terms of sale: "if DAIHATSU/NM and WESTERBEKE come to an agreement on the specifications, prices, minimum purchase quantities, delivery terms, etc. of the said engines, such engines shall be added to the Engines as

defined by the paragraph 1 of the Article 2 of this agreement." Thus, based on the contingent phrase "if [the parties] come to an agreement," it is clear that Article 3.2 did not constitute a conclusive agreement with respect to the E–070 Engine, but rather an understanding that the parties would conduct further negotiations. In essence, Article 3.2 was a preliminary agreement to negotiate.

Because preliminary agreements to negotiate, by definition, leave material terms open for future consideration, courts have struggled not only with the enforceability of such contracts, but also with the damages associated with the breach of them. In *Teachers Insurance and Annuity Association of America v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987), the court developed a useful "taxonomy" of preliminary agreements in order to assess the legal obligations flowing from such agreements. *See also Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir.1996). The *Tribune* decision reasoned that preliminary agreements can be of at least two distinct types: (1) contracts in which the parties have essentially reached agreement (including on the intent to be bound) on all material issues and completion of the agreement is merely contingent on more elaborate formalization of the contract (hereinafter "Type I contracts"), and (2) agreements which express mutual commitment to major terms, while recognizing that other material terms remain open for negotiation (hereinafter "Type II agreements"). *Tribune*, 670 F.Supp. at 498.

There are critical differences between these two types of agreements: "The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type—the binding preliminary commitment—does not commit the parties to their ultimate contractual objective but rather to the *obligation to negotiate* the open issues in good faith in an attempt to reach the alternate objective within the agreed framework." *Id.* (emphasis supplied). Furthermore, parties to Type I contracts may lawfully demand full performance even if the formal agreement is not reached, while parties to Type II agreements may not. *Id.* Parties to Type II agreements may insist, however, that their counterparties *negotiate in good faith* toward completion of their agreement after negotiation on the open terms.[6] *Id.*

The primary concern for courts confronting preliminary agreements, and the reason behind the *Tribune* court's attempt to develop a taxonomy, is to avoid imposing obligations that the parties to an agreement never intended. On the one hand, parties should be free to negotiate without binding themselves to obligations, even when indications of preliminary assent have been exhibited; on the other, the courts are bound to enforce agreements that were intended as binding, even though the formal memorialization has not yet taken place. *Id.* at 497–98.

The Court regards Article 3.2 of the CSA as falling squarely into the category of Type II agreements. It is true that Article 3.2 granted certain binding rights—Westerbeke acquired a clear right

---

**6.** The Court's discussion of the *Tribune* decision should not be mistaken for the proposition that all preliminary agreements should be placed within the taxonomy. Certain preliminary agreements may be so open-ended on material terms that it would be impossible for a court to enforce a legal obligation, a point which the *Tribune* opinion carefully acknowledges: "if the agreement is too fragmentary, in that it leaves open terms of too fundamental importance, it may be incapable of sustaining binding legal obligation." *Id.*, at 497.

of first refusal for certain Daihatsu engines for six months, during which time Daihatsu was not permitted to offer the E–070 Engine to another purchaser. Beyond that, Westerbeke may only demand that Daihatsu "*negotiate* the open terms in good faith toward a final contract incorporating the agreed terms." *Id.*, at 498 (emphasis supplied). By failing to approach Westerbeke in connection with its desire to sell the E–070 Engine in North America and by entering into the joint venture with Briggs, Daihatsu breached its duty to negotiate toward the inclusion of the new product into the CSA.

## B. *NEW YORK STATE LAW OF DAMAGES*

■ Having determined that Article 3.2 reflects a duty to negotiate which Daihatsu breached, there remains the issue of the appropriate measure of damages flowing from that breach. Specifically, the parties disagree as to whether the award should include expectancy damages—anticipated profits that Westerbeke lost as a result of the breach. New York State law controls, as the parties agreed to a choice of law clause stipulating that "[t]his Agreement shall be construed in accordance with and governed by the laws of the State of New York." CSA, Article 27.7.

The appropriate measure of damages from breach of a preliminary agreement to negotiate was directly addressed by the Court of Appeals of New York in *Goodstein Construction Corp. v. City of New York*, 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356 (1992). In *Goodstein*, plaintiff entered into a letter agreement with the City of New York " 'to exclusively negotiate the terms and conditions of a land disposition agreement.' " *Id.* at 1358. Any binding formal agreement was contingent upon obtaining the approval of relevant municipal agencies with jurisdiction over the proposed land disposition. *Id.* Plaintiff's prayer for relief included $800 million, all but $1 million of which consisted of anticipated profits lost from the terminated agreement. *Id.*

As a threshold matter, the court in *Goodstein* characterized the nature of the obligation at issue as a "preliminary agreement to negotiate." *Id.* at 1360. The court held that based upon the breach of the defendant's duty to negotiate, the appropriate measure of damages precludes recovery for plaintiff's expected profits. In particular, the court reasoned that

[t]o allow the profits that plaintiff might have made under the prospective LDA as the damages for breach of the exclusive negotiating agreements would be basing damages not on the exclusive negotiating agreements but on the prospective terms of a nonexistent contract which the City was fully at liberty to reject. It would, in effect, be transforming an agreement to negotiate for a contract into the contract itself.

*Id.* at 1361. Similarly, awarding expectancy damages in this case, where the breach related only to an agreement to negotiate, would give Westerbeke full damages for breach of a contract which was never reached, a result which runs counter to the principle that courts and arbitrators alike should give primary effect to the intentions of the parties. By its terms, Article 3.2 of the CSA required the parties to reach agreement, at minimum, with respect to specifications, prices, purchase quantities and delivery terms. Only satisfaction of these conditions following negotiations would furnish a quantifiable basis upon which to ground a reasonable award of damages. As already indicated, no such negotiations or agreement occurred here.

The principle of damages in *Goodstein* is further refined by the Court of Appeals decision in *Kenford Co. v. County of Erie*,

67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986) (Kenford I); *see also Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989) (Kenford II). In *Kenford I,* the plaintiff entered into a formal contract with the County of Erie for the construction and operation of a domed stadium. *Id.* 493 N.E.2d at 234. The County terminated the contract two years after formal acceptance when it became clear that the parties could not agree upon a mutually acceptable lease. *Id.* at 235. The court held that in order to award lost profits anticipated from the stadium venture, plaintiff was required to show (1) that the damages claimed were caused by the breach; (2) that the alleged damages are capable of determination with reasonable certainty; and (3) that the particular damages were fairly within the contemplation of the parties at the time the agreement was made. *Id.* The plaintiff was precluded from recovering lost profits as yet unrealized because proof of damages fell far short of the standard for reasonable certainty and because the court was not persuaded that liability for lost profits was in the contemplation of the parties at the time of the agreement.

The Court notes that the damages rules in *Goodstein* and *Kenford* have been firmly endorsed in several decisions of this District. *See Schonfeld v. Hilliard,* 62 F.Supp.2d 1062, 1078 (S.D.N.Y.1999) ("[a]pplying those principles here, the purpose of entering the contracts was eventually to capture the profits projected under the business plans, but the [defendant's] anticipation of hypothetical profits does not translate into acceptance of full liability for such profits"), *aff'd in part, rev'd in part on other grounds,* 218 F.3d 164 (2d Cir.2000); *Coastal Aviation, Inc. v. Commander Aircraft Co.,* 937 F.Supp. 1051, 1064 (S.D.N.Y.1996), *aff'd,* 108 F.3d 1369 (2d Cir.1997).

On this authority, the Court holds that the appropriate measure of Westerbeke's damages resulting from Daihatsu's breach of its agreement to negotiate with respect to the E–070 Engines precludes an award of Westerbeke's expected lost profits. Furthermore, the record fails to reflect that Westerbeke's lost profits from an unrealized agreement to include the E–070 Engines in the CSA was fairly in the contemplation of the parties when Article 3.2 took effect.

## C. *THE TRIBUNAL'S AWARD AND MANIFEST DISREGARD OF THE LAW*

■ With respect to the determination of liability above, the Court and the Arbitrator are in complete agreement, at least until the issuance of the Final Award. In particular, the Interlocutory Award found that "[t]he primary issue for decision is whether respondent Daihatsu Motor Company, Limited violated the contractual rights of claimant Westerbeke Corporation in *refusing to negotiate* for the inclusion of the E–070 engines as Engines within the meaning of the 1985 Component Sales Agreement between the two parties. The Tribunal holds that it did." (Interlocutory Award, at 1) (emphasis supplied). This is precisely the conclusion that this Court reached above, and the Court agrees with Daihatsu that this is the only basis of liability that the Arbitrator advanced in the Interlocutory Award.

Notwithstanding the Court's initial concurrence with the Interlocutory Award, the Arbitrator's Final Award takes an unusual and legally fatal turn. In the Final Award, the Arbitrator abandons the sole basis of liability as set forth in the Interlocutory Award and holds that "[t]he appropriate analytical framework is that of a contract with condition precedent to the

addition of a new Engine. The condition precedent, by the terms of the CSA, is agreement on the stated terms." (Final Award, at 6). Reaching further, the Arbitrator proceeded to find a legally binding obligation on the part of Daihatsu to sell E–070 Engines on an exclusive basis to Westerbeke when no such agreement was ever reached because Daihatsu had never engaged in negotiations for inclusion of the new engines within the CSA. The Tribunal arrived at this result by examining and giving weight to documents extrinsic to any negotiation between the parties relating to the E–070 Engines and by concluding on this basis that "Daihatsu never pointed to any disagreement on a specific major term." In this manner, in this Court's estimation, the Final Award stretches beyond the limits of sound jurisprudence and in effect substitutes the Arbitrator's own judgment for the intentions of the parties. (*Id.* at 13).

The Tribunal's finding that there was, in effect, an agreement between the parties with regard to the new engines is particularly untenable in light of commercial realities. Agreements that leave open terms such as specifications, prices, and minimum purchase quantities defer to a later date legal commitment on the most substantial and material terms that comprise a contract. Furthermore, when these crucial conditions are left open, related and corollary issues are also left undecided by the parties.[7]

After advancing this alternative theory of liability in the Final Award, the Arbitrator proceeded to award Westerbeke damages for its expected lost profits. (*See*

Final Award, at 13). This was done in recognition of and in contravention to the principles set forth in *Goodstein* and *Kenford I*.

Westerbeke urges this Court to confirm the Arbitrator's award on several grounds: (1) that *Goodstein* does not apply because it was a real estate case not decided in accordance with the New York Uniform Commercial Code (hereinafter "NY UCC"); (2) that the Tribunal correctly found a binding, fully-integrated contract with a condition precedent in light of N.Y. UCC §§ 2–204 and 2–305; and (3) that N.Y. UCC §§ 2–712 and 2–715 provide the statutory vehicle for awarding expectancy damages. (*See* Reply Memorandum of Westerbeke Corporation in Support of Motion to Confirm Arbitration Award, dated Mar. 13, 2001 (hereinafter "Westerbeke Reply Memorandum"), at 3). None of these arguments justifies confirming the Arbitrator's award.

First, Westerbeke's attempt to explain away the applicability of *Goodstein* fails. Westerbeke avers that *Goodstein* does not apply to Article 3.2 of the CSA because that case involved a real estate transaction not subject to the N.Y. UCC and because *Goodstein* was subject to uncertainties such as municipal approvals not at issue here. (*Id.* at 4). In effect, Westerbeke asks this Court to draw a rigid line between the N.Y. UCC and the common law of contracts in order to award, without legal basis, expectancy damages. There is no case law to support such a rigid differentiation, and this Court declines Westerbeke's invitation to render inapplicable the

---

**7.** For this reason, the Court finds it hardly surprising or probative that Daihatsu linked negotiations on the E–070 Engines with a revocation of Westerbeke's exclusivity and right of first refusal. (*See* Final Award, at 15). In any given six-year period, circumstances change and parties' perceptions of the

benefits of the relationship evolve. Material terms such as price and purchase quantities are often influenced by other considerations and provisions of a contract. This is exactly the reason why preliminary agreements as to future products are often left open for negotiation.

relevant common law rule of damages to an entire category of cases purportedly governed exclusively by the N.Y. UCC.

In *Coastal Aviation,* the court confronted a similar argument from plaintiff that a contract for the sale of goods is not subject to the requirements of certainty and foreseeability set out in *Kenford I.* 937 F.Supp. at 1064 n. 6 ("Coastal attempts to distinguish the instant case from *Kenford I* and its progeny by arguing that the instant case involves a contract for the sale of goods (and is therefore governed by the New York Uniform Commercial Code) rather than a contract for services (governed by the common law)."). The court found plaintiff's argument unpersuasive: "Coastal's attempt to rigidly delineate UCC and common law principles is misplaced.... We conclude that rules of law under the UCC and the common law are not mutually exclusive.... Because there was no market yet for the 114Bs, the principles set forth in *Kenford I* and its progeny are directly applicable to this case." *Id.*

The Court concurs with *Coastal Aviation's* statement on the complementarity of the common law and the N.Y. UCC. The rules set forth in *Goodstein* and *Kenford I* do not stand apart from the N.Y. UCC, but rather, both serve to inform analyses under the other. Thus, the holding in *Goodstein* that expectancy damages are unavailable for the breach of an agreement to negotiate applies directly to the present dispute.

■ The Court's conclusion above also disposes of Westerbeke's second argument, that N.Y. UCC §§ 2–204 and 2–305 permit the finding that the agreement between the parties was a complete, fully-integrated contract with a condition precedent. The relevant portion of N.Y. UCC § 2–204 states: "[e]ven though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." NY UCC § 2–204(3). And N.Y. UCC 2–305 merely stands for the proposition that the parties, if they so intend, may conclude a contract even though agreement on price is left open.

Neither of these two provisions supports Westerbeke's contention as to the existence here of a fully-integrated, binding contract and neither abrogates the common law rule in *Goodstein.* The two provisions merely restate the principle set forth in *Tribune,* that certain preliminary agreements—that is, Type I contracts—constitute complete, binding contracts capable of being enforced by courts notwithstanding incomplete agreement on all terms. Neither provision overrules the common law principle that other agreements that leave material terms open for negotiation can only give rise to a duty to negotiate. That Westerbeke and Daihatsu enjoyed a ten-year relationship that provided for exclusivity with respect to prior models is important to note, but does not change the fundamental character of Article 3.2 of the CSA. When a new engine was contemplated for distribution in North America, Article 3 .2 merely obligated Daihatsu to negotiate in good faith toward agreement on new terms of sale for the new product.

Westerbeke's third argument that N.Y.UCC §§ 2–712[8] and

---

8. The relevant provisions of N.Y. UCC 2–712 state:

(1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

2–715 [9] statutorily permit the award of expectancy damages also fails. Both of these provisions merely state the appropriate measure of damages if the seller breaches his obligation under a full, binding contract. As already noted, the underlying obligation at issue was not a legally binding contract, but an agreement to negotiate. Neither § 2–712 nor § 2–715 alters that conclusion.

In short, Westerbeke's grounds for sustaining the Arbitrator's decision fail. Accordingly, the Court holds that the Tribunal manifestly disregarded the law by abrogating the proper basis for liability set forth in the Interlocutory Award and substituting the theory of a contract with condition precedent in the Final Award. Furthermore, the award to Westerbeke of lost profits expected from the future sales E–070 Engines was made in manifest disregard to the applicable law on damages for breach of an agreement to negotiate.

Recognizing that courts reach the conclusion of manifest disregard of the law only in "extremely limited" instances, the Court underscores the following circumstances that support that finding here: (1) the Arbitrator obviously understood and appreciated the law on preliminary agreements because his Interlocutory Award correctly states the basis for liability, that is, breach of a duty to negotiate; (2) the

Tribunal knew and appreciated the applicable law on damages because Daihatsu had brought the case law to its attention on numerous occasions [10] and because the Tribunal attempted to address those cases in the Final Award. These findings support the conclusion that the applicable standard for vacating an arbitration award was crossed here, that is, that the Arbitrator ignored or refused to apply properly the law on both preliminary agreements and appropriate damages in fashioning his Final Award.

## IV. CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

**ORDERED** that Westerbeke's motion to confirm the arbitration award is denied; and it is further

**ORDERED** that Daihatsu's motion to vacate the arbitration award is granted, and the case is remanded to the Arbitration Tribunal for an appropriate determination of damages consistent with this Decision and Order; and it is finally

**ORDERED** that the Clerk of Court is directed to close this case.

**SO ORDERED.**

---

> (2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2–715), but less expenses saved in consequence of the seller's breach.

**9.** The relevant provisions of N.Y. UCC 2–715 state:

> (2) Consequential damages resulting from the seller's breach include
> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not

reasonably be prevented by cover or otherwise; and
> (b) injury to person or property proximately resulting from any breach of warranty.

**10.** In particular, the Court notes that after the close of the liability phase and before the issuance of the Final Award, Daihatsu succinctly brought the damage principles set forth in *Goodstein* and *Kenford* to the attention of the Arbitrator in the form of a "letter motion." Appendix of Exhibits to Memorandum of Law in Support of Daihatsu Motor Co., Ltd.'s Motion to Vacate the Arbitration Award, Ex. 4.