**WESTERBEKE CORPORATION,**
Petitioner–Appellant,

v.

**DAIHATSU MOTOR CO., LTD.,**
Respondent–Appellee.

Docket No. 01–9224.

United States Court of Appeals,
Second Circuit.

Argued: April 23, 2002.
Decided: Aug. 28, 2002.

John Kenneth Felter, Goodwin Procter LLP, Boston, MA, for appellant.

Allen C.B. Horsley, Leboeuf, Lamb, Greene & MacRae (Jay G. Safer, Daniel F. Lula, on the brief), Boston, MA, for appellee.

Before McLAUGHLIN, F.I. PARKER, and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge:

After a lengthy arbitration spanning several years, during which the arbitrator conducted thirty-one days of hearings, reviewed 5,500 pages of transcripts, and received over 400 exhibits, petitioner Westerbeke Corporation ("Westerbeke") prevailed against respondent Daihatsu Motor Company ("Daihatsu") in its action for breach of a sales agreement. Westerbeke subsequently filed an action in the United States District Court for the Southern District of New York (Marrero, J.), seeking to confirm the $4 million arbitration award pursuant to 9 U.S.C. § 9. Daihatsu moved in turn to vacate the award pursuant to 9 U.S.C. § 10(a)(4). The district court held that, by awarding expectancy damages for a breach of a preliminary agreement, the arbitrator acted in manifest disregard of New York law. It denied Westerbeke's petition, granted Daihatsu's motion to vacate, and remanded to the arbitration tribunal for further proceedings on the damages issue.

We hold that the district court did not accord the proper deference to the arbitrator's factual determinations and improper-

ly set aside his interpretation of the sales agreement as a contract with a condition precedent, rather than as a preliminary agreement. As Daihatsu has not met its burden of demonstrating that this underlying contractual interpretation was itself in manifest disregard of law, it cannot claim that the arbitrator manifestly disregarded New York law by refusing to apply principles that dictate that only reliance damages may be awarded for breach of a preliminary agreement.

Daihatsu argues that the award may alternatively be vacated because the arbitrator (1) acted in manifest disregard of the "law of the case" doctrine; (2) exceeded his authority; and (3) issued an award that was not drawn from the "essence of the agreement." As none of these additional grounds for vacatur has merit, we reverse the judgment of the district court and remand with instructions for the district court to confirm the arbitral award.

## BACKGROUND

In the early 1980s, Westerbeke, a Delaware corporation engaged in the production and marketing of generators, marine generators and marine propulsion engines, expressed interest in doing business with Daihatsu, a subsidiary of the Toyota Motor Company that manufactures engines and engine components. Westerbeke purchased carcass engines from other manufacturers and "marinized" them for resale;[1] Daihatsu produced gasoline-powered carcass engines suitable for marinization. This natural alignment of interests created the prospect of a mutually beneficial business partnership. Accordingly, in 1983, Westerbeke commenced negotiations with Daihatsu for a long-term sales agreement under which Westerbeke would purchase

Daihatsu's carcass engines for eventual marinization and incorporation into Westerbeke's product line. Westerbeke planned to sell its marinized engines both through a distribution network and directly to builders of boats. *Westerbeke Corp. v. Daihatsu Motor Co.,* 162 F.Supp.2d 278, 280 (S.D.N.Y.2001).

The parties ultimately entered into a Component Sales Agreement ("CSA") on May 1, 1985. Under the CSA, Daihatsu agreed to supply Westerbeke with certain contractually-defined engines on an exclusive basis in the United States and Canada. Moreover, Westerbeke also possessed some rights with respect to Daihatsu's future engine models. Article 3.2 of the CSA provided Westerbeke with a limited right of first refusal:

When DAIHATSU desires to sell in the Territory other water-cooled gasoline engines of fewer than four cylinders for the Products than the Engines [sic]. WESTERBEKE shall have the first refusal during the first six months after the date of DAIHATSU's first offer of the Estimate for the said engines. During the said six months of the first refusal for WESTERBEKE, DAIHATSU shall not offer the said engines to any third party in the Territory and if DAIHATSU/NM and WESTERBEKE come to an agreement on the specifications, prices, minimum purchase quantities, delivery terms, etc. of the said engines, such engines shall be added to the Engines as defined by the [sic] paragraph 1 of the [sic] Article 2 of this agreement. In such case, if need be, the parties shall amend the provisions of this agreement relating to the said agreement on the Engines added.

---

1. Marinization is a process whereby carcass engines are modified in order to make them suitable for operation in marine environments.

After the CSA's expiration, it was twice renewed for additional two-year terms. Yet relations between the two companies deteriorated in the early 1990s. At that time, Daihatsu developed a new water-cooled, three-cylinder gasoline engine, the E–070. Instead of offering to sell this new product to Westerbeke, Daihatsu entered into an agreement with another North American distributor, the Briggs & Stratton Corporation ("B & S"). This agreement granted B & S the exclusive right to distribute the E–070.

Westerbeke eventually learned of Daihatsu's business arrangement with B & S through advertisements in trade publications. *Id.* at 282. Westerbeke was eager to gain access to Daihatsu's new engine, particularly as the E–070, unlike Westerbeke's then-current product line, could be sold in the United States under the new emissions standards promulgated by the federal Environmental Protection Agency and the California Air Resources Board.

In late 1993, the parties entered into negotiations for the sale of the E–070 engine. No agreement was ever finalized, however, because Daihatsu conditioned the sale of the engines on Westerbeke's renunciation of its rights of first refusal and exclusivity. In October 1994, Daihatsu provided Westerbeke with timely notice that it did not desire to renew the CSA. The CSA was therefore terminated as of April 30, 1995. Under Section 14.2 of the CSA, Westerbeke was allowed to put in a final order for all Daihatsu engines that fell within the scope of the CSA, excluding the E–070.

In 1997, Westerbeke filed actions in the Norfolk Superior Court and the United States District Court for the District of Massachusetts. Westerbeke filed a separate action against B & S for its role in the dispute between the parties. All of these actions were voluntarily dismissed or stayed when Westerbeke invoked Article 23 of the CSA, which required that all disputes be resolved by arbitration pursuant to the Japan–American Trade Arbitration Agreement of September 16, 1952. Pursuant to the CSA, the situs of arbitration was New York.

The arbitrator bifurcated the proceedings into a liability and a damages phase. The liability phase was almost exclusively focused on the question of whether the E–070 was an engine within the meaning of Article 3.2. The arbitrator therefore examined the facially ambiguous [2] language of Article 3.2: "When DAIHATSU desires to sell in the Territory other water-cooled gasoline engines of fewer than four cylinders for the Products than the Engines." The parties had advanced two separate readings of that phrase. Westerbeke argued that its right of first refusal was triggered if a new engine was suitable for use in Westerbeke's marine generator sets or marine propulsion engines. Daihatsu, in contrast, contended that a new engine fell within the scope of Article 3.2 only if Daihatsu "desired" to sell the engine for use in marine generator sets or marine propulsion engines. Finding both of these readings plausible, the arbitrator ultimately concluded that Article 3.2 had been adopted in order to secure Westerbeke's access to a continuous supply of engines on an exclusive basis. The arbitrator therefore read the provision in favor of Westerbeke. The arbitrator also noted that, because Daihatsu had drafted Article 3.2, it would be fair to interpret any ambiguity in the provision against Daihatsu.

In his Interlocutory Award memorializing his liability rulings, the arbitrator stated:

2. The CSA was drafted in English by persons whose native tongue was Japanese.

The primary issue for decision is whether respondent Daihatsu Motor Company, Limited violated the contractual rights of claimant Westerbeke Corporation in refusing to negotiate for the inclusion of the E–070 engines as Engines within the meaning of the 1985 Component Sales Agreement between the two parties. The Tribunal holds that it did. Despite this reference to a "[refusal] to negotiate," the parties had not up to that point briefed and the arbitrator did not explicitly rule on whether Article 3.2 of the CSA constituted a preliminary agreement to agree.[3] In fact, the arbitrator also used language suggesting that Article 3.2 was a contract with condition precedent. For example, the arbitrator described the negotiation of "such matters as quantit[y] ... and delivery terms as a precondition to an engine's [sic] becoming an Engine," and noted that "Westerbeke would have the right of first refusal on engines meeting a certain definition, subject to stated conditions."

After the arbitrator handed down his Interlocutory Award, the parties briefed the damages issue. At the arbitrator's request, Daihatsu submitted a supplemental letter brief on the applicability of *Goodstein Constr. Corp. v. City of New York*, 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356 (1992), which prohibits the award of expectancy damages for the breach of a preliminary agreement. Daihatsu argued that, given the arbitrator's finding at the liability phase that Daihatsu had violated Westerbeke's contractual rights by "refusing to negotiate," *Goodstein* obviated all of Westerbeke's damages as a matter of law. Westerbeke countered that *Goodstein* did not apply because (1) the CSA, unlike the contract at issue in *Goodstein*, was a binding contract with open terms under the N.Y. U.C.C.; and (2) lost profits damages were reasonably foreseeable in the present case, while they were not foreseeable in *Goodstein*.

In the Final Award, the arbitrator reaffirmed his liability holding that Daihatsu had violated its duty to negotiate at the damages phase of the proceedings, yet observed: "Whether Westerbeke is entitled to expectancy damages depends, at least in part, upon Daihatsu's obligations under the contract. The essence of Daihatsu's argument is that, even assuming (as this Tribunal had held) that Daihatsu was legally obliged to negotiate toward agreement during the six-month right of first refusal period and that it did not do so, New York law limits Westerbeke's recovery to reliance damages."

**3.** We use the term "preliminary agreement" to refer specifically to what Judge Leval has termed a type-two preliminary agreement: a contract "that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated." *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F.Supp. 491, 498 (S.D.N.Y.1987). Such a contract "does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework." *Id.* A party to such a preliminary agreement may not demand lawful performance of the underlying contractual terms; he or she may only demand "that [the] counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract." *Id.*

In contrast, under a contract with condition precedent, a party is bound to perform his or her contractual obligations. This obligation is conditioned, however, upon the prior occurrence of some event or the performance of some act. *Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.*, 807 F.Supp. 1007, 1022 (S.D.N.Y.1992).

Relying on cases such as *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.,* 670 F.Supp. 491 (S.D.N.Y.1987), the arbitrator rejected Westerbeke's argument that Article 3.2 of the CSA created an enforceable contract for the purchase of the E–070 engines under N.Y. U.C.C. § 2–204(3)[4] or N.Y. U.C.C. § 2–305(1)[5] regardless of whether the parties agreed on sales terms for the E–070 engine. The arbitrator held that Article 3.2 was not a binding contract with open terms under the New York U.C.C., because the terms left open by Article 3.2 were substantive and significant and because, under the express terms of the CSA, an enforceable contract for the sale of the E–070 would be formed only "if DAIHATSU/NM and WESTERBEKE [came] to an agreement on the specifications, prices, minimum purchase quantities, delivery terms, etc. of the said engines."

The arbitrator likewise rejected Daihatsu's argument that Article 3.2 was a preliminary agreement to agree, however. Instead, the arbitrator found that "[t]he fact that Daihatsu had a legal obligation to negotiate in good faith with Westerbeke but did not do so ... does not help to answer the question of whether Westerbeke is entitled to expectancy damages for its breach. The appropriate analytical framework is that of a contract with condition precedent to the addition of a new Engine." The arbitrator's construction of Article 3.2 as a contract with condition precedent was influenced in part by his finding that Article 3.2 was fashioned to prevent Daihatsu from balking at negotiating with Westerbeke and thereby rendering "the right of first refusal for which Westerbeke had bargained ... illusory." The arbitrator also based this conclusion on repeated statements made by both parties during the arbitration that indicated that, once the "condition" of agreement on the terms of sale had been met, the E–070 would become an Engine within the scope of the CSA. From this evidence, the arbitrator inferred that Westerbeke's right of first refusal became operative once the condition precedent of agreement on the relevant purchase terms was satisfied. Under the arbitrator's construction of Article 3.2, this condition precedent was met so long as there was an "objective" meeting of the minds on the four specified terms—specifications, price, minimum purchase quantities, and delivery terms—even if the parties did nothing to express this agreement, and even if Daihatsu "did not want to sell the engine at all—and therefore did not make a formal offer or would not sign a contract." Relying largely on the fact that no *disagreements* over material items were identified by the parties, the arbitrator found that this condition precedent had in fact been satisfied.[6] The arbitrator concluded: "Consequently, assuming for purposes of analysis the applicability under the UCC of *Goodstein* ... and like cases, they do not insulate Daihatsu from expectancy damages." The arbitrator awarded Westerbeke approximately $4 million in cover and lost profit damages.

---

**4.** "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." U.C.C. § 2–204(3).

**5.** "The parties if they so intend can conclude a contract for sale even though the price is not settled." N.Y. U.C.C. § 2–305(1).

**6.** In particular, the arbitrator found that Daihatsu had standardized sales terms for the E–070 engines. Daihatsu primarily sold the E–070 to its customers in two configurations: either complete or with certain parts removed. It charged a standard price-a price that Daihatsu at one point quoted to Westerbeke-depending upon which engine the customer purchased.

Westerbeke brought an action in the Southern District of New York to confirm the arbitration award. Daihatsu moved to vacate, arguing that the arbitrator (1) manifestly disregarded New York damages law; (2) exceeded the scope of his authority in violation of 9 U.S.C. § 10(a)(4); (3) manifestly disregarded the record and terms of the CSA; and (4) manifestly disregarded the "law of the case" doctrine. *Westerbeke*, 162 F.Supp.2d at 283. The district court vacated the arbitrator's award for manifest disregard of New York damages law without reaching the other three grounds. The district court relied in part on the fact that the arbitrator had made only a single liability finding in its Interlocutory Award: that Daihatsu violated Westerbeke's contractual rights by failing to negotiate for the inclusion of the E–070 engine in the CSA. *Id.* at 288. Rejecting the arbitrator's reading of Article 3.2 as a contract with condition precedent in the Final Award, *id.* at 288–89 ("Notwithstanding the Court's initial concurrence with the Interlocutory Award, the Arbitrator's Final Award takes an unusual and legally fatal turn.... [T]he Final Award stretches beyond the limits of sound jurisprudence and in effect substitutes the Arbitrator's own judgment for the intentions of the parties."), the district court found instead that Article 3.2 created a binding preliminary agreement, *id.* at 286–87. Applying *Goodstein*, the district court concluded that only reliance damages could be awarded for a breach of that contractual provision.

## DISCUSSION

■ "We review a district court's decision vacating the arbitration award *de novo*, as it turns entirely on questions of law." *N.Y. Tel. Co. v. Communications Workers of Am. Local 1100*, 256 F.3d 89, 91 (2d Cir.2001); *see also Pike v. Freeman*, 266 F.3d 78, 86 (2d Cir.2001) ("In reviewing a district court's confirmation of an arbitral award, we review legal issues *de novo* and findings of fact for clear error.").[7]

### I. Manifest Disregard of New York Law of Damages

■ In addition to the grounds for vacatur explicitly provided for by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 10(a), an arbitral decision may be vacated when an arbitrator has exhibited a "manifest disregard of law." *Wilko v. Swan*, 346 U.S. 427, 436, 74 S.Ct. 182, 98 L.Ed. 168 (1953), *overruled on other grounds*, *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). Our standard of review under this judicially created doctrine is "severely limited." *Gov't of India v. Cargill Inc.*, 867 F.2d 130, 133 (2d Cir.1989). To vacate the award, we must find "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." *Saxis S.S. Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 582 (2d Cir.1967) (quotation marks omitted); *see also Folkways Music*

7. Daihatsu argues that the district court's determination that the arbitrator manifestly disregarded the law is a question of fact that we must review for clear error. Although some courts have said that a court must "find" manifest disregard, *see, e.g., Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 28 (2d Cir.2000), those same courts uniformly apply a *de novo* standard of review. *See id.* ("A district court's application of the manifest disregard standard is a legal determination that we review *de novo*."); *see also Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir.1997) ("[We] review *de novo* a district court's review of arbitration awards under the 'manifest disregard of law' standard.").

*Publishers., Inc. v. Weiss,* 989 F.2d 108, 111 (2d Cir.1993) ("In order to advance the goals of arbitration, courts may vacate awards only for an overt disregard of the law and not merely for an erroneous interpretation."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986) ("Although the bounds of this ground have never been defined, it clearly means more than error or misunderstanding with respect to the law."). The party seeking vacatur bears the burden of proving manifest disregard. *Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22, 28 (2d Cir.2000).

The two-prong test for ascertaining whether an arbitrator has manifestly disregarded the law has both an objective and a subjective component. We first consider whether the "governing law alleged to have been ignored by the arbitrators [was] well defined, explicit, and clearly applicable." *Merrill Lynch,* 808 F.2d at 934. We then look to the knowledge actually possessed by the arbitrator. The arbitrator must "appreciate[ ] the existence of a clearly governing legal principle but decide[ ] to ignore or pay no attention to it." *Id.* at 933. Both of these prongs must be met before a court may find that there has been a manifest disregard of law. *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202 (2d Cir.1998); *DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 821 (2d Cir. 1997); *Folkways Music,* 989 F.2d at 112.

We hold that Daihatsu has not met its burden of demonstrating either the existence of a clearly governing legal principle or the arbitrator's manifest disregard of such a principle.

## A. Clearly Governing Legal Principle

### New York Law of Damages

A legal principle clearly governs the resolution of an issue before the arbitrator if its applicability is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Merrill Lynch,* 808 F.2d at 933. We begin our analysis by outlining the legal principles Daihatsu claims clearly control the outcome of this case. Daihatsu points specifically to *Kenford Co. v. County of Erie,* 67 N.Y.2d 257, 502 N.Y.S.2d 131, 493 N.E.2d 234 (1986) ("*Kenford I* "), *Kenford Co. v. County of Erie,* 73 N.Y.2d 312, 540 N.Y.S.2d 1, 537 N.E.2d 176 (1989) ("*Kenford II* "), and *Goodstein Const. Corp. v. City of New York,* 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356 (1992), a trilogy of New York Court of Appeals decisions that together set forth the standard for assessing what measure of damages is appropriate to remedy breaches of contractual obligations.

The *Kenford* appeals arose from a single contractual dispute. The plaintiff had contracted to donate land to Erie County. In return, the County had agreed to build a stadium on the land, which the plaintiff would then operate. As part of the agreement, the County was to assess increased real estate taxes on "peripheral lands" developed by the plaintiff. For budgetary reasons, the County reneged on its agreement to construct the stadium. The plaintiff sued for breach of contract and was awarded lost profits for plaintiff's contemplated operation of the stadium, as well as damages for the loss of the anticipated appreciation in the value of the peripheral lands. *Kenford I* addressed the former damages award, while *Kenford II* considered a separate challenge to the latter land appreciation damages award.

In *Kenford I,* the Court of Appeals held that lost profit damages may be awarded only if (1) a plaintiff demonstrates with reasonable certainty that such damages have been caused by the breach; (2) the

alleged loss was capable of proof with reasonable certainty; and (3) lost profit damages were fairly within the contemplation of the parties at the time of contracting. 67 N.Y.2d at 261, 502 N.Y.S.2d 131, 493 N.E.2d 234. Finding that the lost profits award was based on a speculative assessment of how much income would be generated by the never-constructed stadium, the Court of Appeals held that plaintiff's proof failed on the second prong. *Id.* at 262, 502 N.Y.S.2d 131, 493 N.E.2d 234. The Court of Appeals also found, on the basis of the record before it, that lost profits damages had not been within the contemplation of the parties. *Id.*

In *Kenford II*, the Court of Appeals reaffirmed that a party may not be liable for special damages unless such damages were within the reasonable contemplation of the parties at the time of contracting. 73 N.Y.2d at 319, 540 N.Y.S.2d 1, 537 N.E.2d 176. After reviewing the contract to discern "what the parties would have concluded had they considered the subject," the *Kenford II* Court determined that the County had never intended to assume liability for the lack of appreciation in the plaintiff's investment. *Id.* at 320, 540 N.Y.S.2d 1, 537 N.E.2d 176. The Court of Appeals concluded that "[a]ccording to Kenford's version of the facts, Kenford was to realize all of its anticipated gains with or without the stadium. Clearly, such a result is illogical and without any basis whatsoever in the record." *Id.* at 321, 540 N.Y.S.2d 1, 537 N.E.2d 176.

Finally, in *Goodstein,* the Court of Appeals held that a plaintiff was entitled only to reliance damages for the breach of a contractual duty to negotiate in good faith arising under a preliminary agreement. 80 N.Y.2d at 372–73, 590 N.Y.S.2d 425, 604 N.E.2d 1356. At issue in *Goodstein* was a letter agreement in which the City of New York ("the City") and a real estate developer had agreed, among other things, to negotiate the terms of a land disposition agreement ("LDA") for a particular plot of real estate. Under the letter agreement, the City "retain[ed] the right to terminate negotiations at any time in which case the City could negotiate with any other applicant or non-applicant." *Id.* at 369, 590 N.Y.S.2d 425, 604 N.E.2d 1356. Moreover, if the negotiations were successfully completed, the LDA would become binding only if certain conditions were fulfilled, including approval by the various community and city planning boards. The City breached this letter agreement when the City decided to reserve the site in question for commercial development and refused to negotiate in good faith with the plaintiff. *Id.* at 370–71, 590 N.Y.S.2d 425, 604 N.E.2d 1356.

In deciding that the plaintiff was precluded, as a matter of law, from recovering the lost profits it would have realized if the LDA had been successfully negotiated, the Court of Appeals emphasized that the City's obligations arose from a preliminary agreement and not a completed LDA. *Id.* at 372, 590 N.Y.S.2d 425, 604 N.E.2d 1356 ("An analysis of plaintiff's claim for loss of profits must start with an examination of the precise nature of the obligation on which the claim is based. That obligation, it must be emphasized, arises not from the actual LDA, but from a preliminary agreement to negotiate an LDA."). Moreover, the City's anticipated performance under the LDA was expressly conditioned on factors that were outside the City's control. Because the City's sole obligation was to put the plaintiff in "as good a position as it would have been in had the contract been performed," and because "[t]he City was neither bound to agree to an LDA nor to continue the negotiating process," granting expectancy damages on the prospective terms of a contract that the City was at liberty to reject would have placed the

plaintiff in a better position than plaintiff would have enjoyed had the City satisfied its obligations under the preliminary agreement. *Id.* at 373, 590 N.Y.S.2d 425, 604 N.E.2d 1356.

*The Arbitrator's Construction of the CSA*

■ In attempting to evaluate whether the principles outlined above govern our consideration of the CSA, we encounter a threshold problem—namely, the inherent difficulty in determining whether a given legal principle controls the outcome of this case while the nature of the CSA remains in dispute. Although Daihatsu's appeal ostensibly challenges the arbitrator's manifest disregard of New York's law of damages, a closer examination of the arguments advanced by Daihatsu reveals that, in fact, Daihatsu contests the tribunal's allegedly impermissible reading of the CSA as a contract with condition precedent.

Daihatsu protests that it is not disputing the arbitrator's factual findings. Rather, Daihatsu maintains that, because the arbitrator had previously determined in the Interlocutory Award that the only obligation imposed by Article 3.2 was a duty to negotiate in good faith, and because, by the arbitrator's own admission, this liability ruling remained binding in the Final Award, the only "authentic" factual finding and contractual interpretation made by the arbitrator was that Article 3.2 was an agreement to negotiate. The record does not support Daihatsu's reading of the arbitral judgment, however.

Any ambiguity on this issue stems from the fact that the arbitrator alternatively uses the language of preliminary agreement and of contracts with condition precedent in the Interlocutory and Final Awards. Admittedly, were we to examine the Interlocutory Award in isolation, we might conclude that the arbitrator construed Article 3.2 as a preliminary agreement, under which the parties bound themselves to negotiate in good faith to work out the remaining open terms. *Cf. Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir. 1996). But that issue was not before the arbitrator at that stage of the proceedings, and as noted *supra* at 206, other language in the Interlocutory Award indicated that the arbitrator had read Article 3.2 as creating a contract with condition precedent. We need not deconstruct the Interlocutory Award in order to figure out how the arbitrator construed the CSA, however, as the arbitrator clarified his findings in the Final Award. There, the arbitrator indicated that Article 3.2 must be read as a contract with condition precedent, the condition in question being objective agreement on the sale terms. The arbitrator further suggested that this condition had in fact been satisfied: "[T]he Tribunal has reviewed the record itself in order to ensure that the condition precedent to the addition of the E–070 [to the CSA] was met. There was no genuine dispute over terms here." In rendering his decision, the arbitrator relied on the fact that Westerbeke had a contractual right of first refusal. This right was more extensive than a mere right to negotiate for terms. Thus, the arbitrator concluded that the contract could not be read in such a way that Daihatsu could eviscerate Westerbeke's contractual right of first refusal if Daihatsu later decided not to sell its new products to Westerbeke through the simple expedient of refusing to give its consent to acceptable terms proposed by Westerbeke.

■ Daihatsu asks that we ignore these later findings as plainly contrary to the arbitrator's previous liability holding. As a preliminary matter, internal inconsistencies within an arbitral judgment are not grounds for vacatur. *See Saint Mary*

*Home, Inc. v. Serv. Employees Int'l Union, Dist. 1199*, 116 F.3d 41, 44–45 (2d Cir.1997) ("Internal inconsistencies in the opinion are not grounds to vacate the award notwithstanding the Home's plausible argument that the arbitrator's decision was misguided or our own concerns regarding the arbitrator's conclusion."). More to the point, we see no inherent inconsistency between the findings made by the arbitrator at the Interlocutory and Final Award stages of the arbitration proceeding.

Daihatsu assumes that, because the arbitrator held at the liability phase of the arbitration proceedings that Daihatsu breached the CSA by failing to negotiate for terms, the arbitrator necessarily construed Article 3.2 as a preliminary agreement to agree. The arbitrator's finding that Daihatsu had breached its contractual obligations by "refusing to negotiate" is not inherently irreconcilable with the arbitrator's later reading of the CSA as a contract with condition precedent, however. Assuming that Article 3.2 creates a contract with condition precedent, Daihatsu would have had an implied obligation "not to do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract" or to act in such a way as to "frustrate[ ] or prevent[ ] the occurrence of the condition." *A.H.A. Gen. Constr., Inc. v. N.Y. City Hous. Auth.*, 92 N.Y.2d 20, 31, 677 N.Y.S.2d 9, 699 N.E.2d 368 (1998) (quotation marks omitted); *see also Stern v. Gepo Realty Corp.*, 289 N.Y. 274, 277, 45 N.E.2d 440 (1942) ("[T]he well-established rule [is] that one may not take advantage of a condition precedent, the performance of which he himself has rendered impossible."). The breach referred to by the arbitrator in the Interlocutory Award can plausibly be seen as a breach of this implied duty of good faith to fulfill the condition precedent. *Cf. E. Consol. Props., Inc. v. Adelaide Realty Corp.*, 261 A.D.2d 225, 230, 691 N.Y.S.2d 45 (1st Dep't 1999) (holding that where a contracting party conditions the contract on the transfer of a title, that party "implicitly promised to use his good faith best efforts to bring about this result") (quotation marks omitted); *Stendig, Inc. v. Thom Rock Realty Co.*, 163 A.D.2d 46, 48, 558 N.Y.S.2d 917 (1st Dep't 1990) ("[T]he express language of the condition [may] give rise to the implied language of promise."); *see also Cauff, Lippman & Co. v. Apogee Fin. Group, Inc.*, 807 F.Supp. 1007, 1022 (S.D.N.Y.1992) ("The prevention doctrine is substantially related to the implied covenant of good faith and fair dealing implicit in every contract.... The implied covenant of good faith and fair dealing requires a promisor to reasonably facilitate the occurrence of a condition precedent by either refraining from conduct which would prevent or hinder the occurrence of the condition, or by taking positive action to cause its occurrence." (citations omitted)). The arbitrator could have concluded that, by refusing to negotiate for terms, Daihatsu had breached its obligation to help bring about the occurrence of the relevant condition—agreement on proposed, acceptable terms—and therefore thwarted the formation of the contract.[8]

---

8. To the extent that there was any remaining ambiguity with respect to the arbitrator's construction of Article 3.2 following the issuance of the Final Award, we still would adopt our present understanding of the arbitrator's findings. We are obliged to give the arbitral judgment the most liberal reading possible. When reviewing an award where the arbitration tribunal has failed to detail its underlying factual findings, for example, we will confirm the award if we are able to discern any colorable justification for the arbitrator's judgment, even if that reasoning would be based on an error of fact or law. *Willemijn,* 103

■ Notwithstanding the arbitrator's finding that the "appropriate analytical framework" for assessing damages for a breach of Article 3.2 "is that of a contract with condition precedent," the district court, embarking upon an independent examination of the contractual language, found that Article 3.2 of the CSA instead constituted a preliminary agreement. *Westerbeke,* 162 F.Supp.2d at 286–87. Under the manifest disregard standard, however, the governing law must clearly apply to the facts of the case, *as those facts have been determined by the arbitrator. See Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc.,* 274 F.3d 34, 36–37 (1st Cir.2001) ("An arbitrator's factual findings are generally not open to judicial challenge, and we accept the facts as the arbi-

trator found them." (quotations marks and citations omitted)); *ConnTech Dev. Co. v. Univ. of Conn. Educ. Props., Inc.,* 102 F.3d 677, 687 (2d Cir.1996) (holding that an erroneous factual determination is not a ground for vacating an arbitration award); *In re S.E. Atl. Shipping Ltd.,* 356 F.2d 189, 191–92 (2d Cir.1966) ("Under our limited scope of review of arbitration awards, we are bound by the arbitrators' factual findings and by their interpretation of the contract . . . ."); *cf. United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 39, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987) ("No dishonesty is alleged; only improvident, even silly, factfinding is claimed. This is hardly a sufficient basis for disregarding what the agent appointed by the parties determined to be the historical facts.").[9]

F.3d at 13; *see also Halligan,* 148 F.3d at 204 (vacating an arbitration award only where the court was unable to discern any justification for the decision that would not "have strained credulity"); *Fahnestock & Co. v. Waltman,* 935 F.2d 512, 516 (2d Cir.1991) (confirming award so long as any colorable justification supports the decision); *Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 894 (2d Cir.1985) (confirming an arbitration award of damages even though arbitration tribunal did not explain the calculation used to arrive at the damages amount because the moving party had submitted an affidavit explaining how the tribunal may have arrived at its damages award without violating the governing law).

The strong presumption that an arbitration tribunal has not manifestly disregarded the law applies as forcefully when an tribunal outlines its reasoning as when the tribunal provides no rationale for its decision. The difference, of course, is that we cannot postulate a colorable justification for the arbitrator's decision if that justification is clearly contrary to the reasoning actually offered by the arbitrator. *See Ottley v. Sheepshead Nursing Home,* 688 F.2d 883, 891–92 & n. 2 (2d Cir.1982) (Newman, J., concurring) (observing that, where an arbitrator makes an explicit statement of the exclusive basis for the judgment, review must focus on that reasoning). Thus, where the arbitral tribunal has handed down an opinion open to more than one possible reading, we will confirm the

award so long as, under one of these readings, the judgment rests upon a colorable interpretation of law. *Cf. United Steelworkers v. Enter. Wheel & Car Corp.,* 363 U.S. 593, 598, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) (holding that, in reviewing an arbitration decision under § 301 of the Labor Management Relations Act, "[a] mere ambiguity in the opinion accompanying an award, which permits the inference that the arbitrator may have exceeded his authority, is not a reason for refusing to enforce the award").

9.  We recognize that this Court has previously suggested in *dicta* that an award could be vacated where the arbitrators "manifestly disregarded ... the evidence" presented during the arbitration proceeding. *See Halligan,* 148 F.3d at 204. *Halligan* presented the special circumstance in which the arbitration tribunal did not issue a written explanation of its factual findings. The reviewing court was therefore placed in the situation of attempting to discern what possible findings the arbitrators *could* have made that would justify their disposition of the case. Unable to come up with any findings that would not "strain credulity," the court concluded that the tribunal must have "manifestly disregarded the law or the evidence or both." *Id. Halligan* does not stand for the proposition that factual findings put on the record by the arbitrator are subject to an independent judicial review, however.

The arbitrator's factual findings and contractual interpretation are not subject to judicial challenge, particularly on our limited review of whether the arbitrator manifestly disregarded the law. *See Yusuf Ahmed Alghanim & Sons v. Toys 'R' Us, Inc.*, 126 F.3d 15, 25 (2d Cir.1997) ("Interpretation of [a] contract term[ ] is within the province of the arbitrator and will not be overruled simply because we disagree with that interpretation."); *see also id.* at 23 ("This court has generally refused to second guess an arbitrator's resolution of a contract dispute."); *In re Andros Compania Maritima*, 579 F.2d 691, 704 (2d Cir. 1978) ("[W]hatever arbitrators' mistakes of law may be corrected, simple misinterpretations of contracts do not appear to be one of them.") (quotation marks omitted); *In re I/S Stavborg*, 500 F.2d 424, 431 (2d Cir.1974) (holding that there are no grounds to reverse arbitration award based on a clearly erroneous contract interpretation); *cf. Misco*, 484 U.S. at 37–38, 108 S.Ct. 364 ("[I]t is the arbitrator's view of the facts and of the meaning of the contract that [the parties] have agreed to accept.").

Both Daihatsu and the district court impermissibly conclude that *Goodstein* establishes the applicable legal principle only because they reject the arbitrator's conclusion that Article 3.2 created a contract with condition precedent and that this condition—objective agreement on the terms—had been satisfied. *See Westerbeke*, 162 F.Supp.2d at 289 ("The Tribunal's finding that there was, in effect, an agreement between the parties with regard to the new engines is particularly untenable in light of commercial realities."). Whether or not *Goodstein* is clearly applicable to the CSA as construed by *Daihatsu*, as opposed to the contract as construed by the arbitrator, is irrelevant. Unless Daihatsu can show that the arbitrator manifestly disregarded a clearly applicable and explicit principle of contract construction in reading Article 3.2 as a contract with condition precedent, we will not disturb the arbitrator's contractual interpretation. Daihatsu cannot make this showing.

■ The determinative factor in differentiating a nonbinding preliminary agreement from a binding contract is the intent of the parties. *See, e.g., Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 497 (S.D.N.Y.1987) (underscoring that, in differentiating between a binding contract and a preliminary agreement, "prime significance attaches to the intentions of the parties and to their manifestations of intent"); *Kleinschmidt Div. v. Futuronics Corp.*, 41 N.Y.2d 972, 973, 395 N.Y.S.2d 151, 363 N.E.2d 701 (1977) (holding that whether parties intended for an agreement to be binding despite the existence of open terms is a question of fact); *Marquette Co. v. Norcem, Inc.*, 114 A.D.2d 738, 739, 494 N.Y.S.2d 511 (3d Dep't 1985) (same); *cf. Forgan v. McKenzie*, 12 Misc.2d 508, 175 N.Y.S.2d 322, 326 (Sup. Ct.1958) (holding that whether contractual provision constituted condition precedent depended on the intent of the parties). The arbitrator correctly applied this legal standard. The arbitrator "recogniz[ed] the importance of intent" in ascertaining the nature of the CSA, and set about gleaning the parties' intent from "the evidence of the record, and primarily from the CSA itself." Based on his review of the relevant evidence, the arbitrator found that the parties adopted Article 3.2 in order to secure Westerbeke a right of first refusal for new Daihatsu products, but in order to protect Daihatsu, conditioned Westerbeke's exercise of this right on the parties' objective agreement on purchase terms.

*Goodstein,* the only controlling case law identified by Daihatsu, does not speak to the issue of whether a contract such as the CSA must be interpreted as a preliminary agreement. Rather, *Goodstein* starts from the assumption that the contract at issue is a preliminary agreement, *see Goodstein,* 80 N.Y.2d at 372, 590 N.Y.S.2d 425, 604 N.E.2d 1356 ("[The obligation on which the claim is based], it must be emphasized, arises not from the actual LDA, but from a preliminary agreement to negotiate an LDA."), and then states the damages rule that should be applied to such a contract. *Goodstein* by no means mandates that the CSA must likewise be construed as a preliminary agreement. Article 3.2 differs from the preliminary agreement in *Goodstein* in several material respects. Under the *Goodstein* agreement, the only right enjoyed by the plaintiff was exclusively to negotiate the terms of a possible LDA with the City until such time as the City exercised its right to terminate negotiations. *Id* at 369, 590 N.Y.S.2d 425, 604 N.E.2d 1356. In contrast, Daihatsu did not reserve the right to terminate negotiations with Westerbeke. Indeed, there is no reference in Article 3.2 to a right to "negotiate." Westerbeke instead bargained for a much broader right of first refusal.

Moreover, unlike the *Goodstein* agreement, Article 3.2 is couched in mandatory language. It affirmatively provides that Westerbeke "shall have the first refusal during the first six months after the date of [Daihatsu's] first offer of the Estimate for the said engines ..., and if [the parties] come to an agreement on the specifications, prices, minimum purchase quantities, delivery terms, etc. of the said engines, such engines shall be added" to the CSA. The arbitrator relied extensively on this language of "first refusal" in reaching his conclusion that Westerbeke had bargained for greater rights than had the plaintiff in *Good-*

*stein.* The arbitrator's distinguishing of *Goodstein* is not without color.

■ Daihatsu next claims that, as a matter of law, "a duty to negotiate toward a contract ... cannot *itself* be a 'contract with condition precedent'" because a condition precedent must be a provision within an existing contract. This argument is easily refuted. First, Article 3.2 is a provision within an existing contract—the CSA. Second, under New York law, a condition precedent can be either a condition that must occur before a party's performance under an existing contract becomes due or a condition to the formation of the contract itself. *See Allis–Chalmers Mfg. Co. v. Malan Constr. Corp.,* 30 N.Y.2d 225, 231 n. 4, 331 N.Y.S.2d 636, 282 N.E.2d 600 (1972). For our purposes, it is irrelevant whether the arbitrator understood "objective agreement on terms" as a condition within the existing CSA that, if met, would trigger Daihatsu's further performance under the CSA (specifically, the sale of the E–070 engine), or as a condition precedent to the formation of a separate contract for the sale of the E–070 engine. Daihatsu has not identified a governing principle that would preclude either interpretation.

More fundamentally, Daihatsu misconstrues the arbitrator's holding. The arbitrator did not hold that a preliminary agreement containing only a duty to negotiate is the functional equivalent of a contract with condition precedent. Instead, he rejected Daihatsu's argument that Article 3.2 should be read as a preliminary agreement.

Finally, Daihatsu urges us to hold, as a matter of law and sound public policy, that "agreement on terms" cannot be the condition precedent to the formation of a contract: "The effect of the Arbitrator's 'analytical framework' is to convert all covenants to negotiate toward agreement

into 'contracts with a conditions precedent,' the condition being agreement on terms." The defendant errs by presupposing that the arbitrator's conclusion with respect to one contract—a conclusion which turns on the intentions of the contracting parties—would translate into a *per se* rule governing all contracts that contain a provision requiring negotiation of terms. In any event, this is not the proper forum for a policy debate over the optimal construction of a contract such as the CSA. We do not sit in judgment over the wisdom of the arbitrator's holdings.[10] *See Pike*, 266 F.3d at 86. More pertinently, our announcement of such a principle, no matter how well-founded, would not affect the outcome of this case. Our sole task is to determine whether there *already* exists a well-defined, clearly governing decisional rule under New York law that would prohibit the arbitrator from reading the CSA as a contract with condition precedent. Daihatsu has not met its burden of showing that such a rule exists.

*Application of* Goodstein *and* Kenford *to the CSA as Construed by the Arbitrator*

■ Because the arbitrator was within the bounds of his authority in interpreting the CSA as a contract with condition precedent, the district court should have analyzed whether *Goodstein* or *Kenford I* and *II* clearly and explicitly foreclose an award of expectancy damages as a remedy for the breach of a duty to refrain from thwarting the occurrence of a condition precedent. We now conclude that they do not. As a general matter, if the cases that establish a particular legal principle are factually distinguishable in a material respect from the case at bar, then that principle is not "well defined, explicit, and clearly applicable." We have twice endorsed this particularized, fact-specific approach when reviewing whether an award of lost profit damages for a new business contravened the principles set forth in the *Kenford* cases. *Toys 'R' Us*, 126 F.3d at 24; *Int'l Telepassport Corp. v. USFI, Inc.*, 89 F.3d 82, 85 (2d Cir.1996) (holding that, because *Kenford I* did not establish a *per se* rule prohibiting the award of expectancy damages to a new business, the arbitrator did not violate a "clearly governing legal principle" by awarding lost profits to a new business); *see also W.K. Webster & Co. v. Am. President Lines, Ltd.*, 32 F.3d 665, 669 (2d Cir.1994) (holding that an arbitration panel did not manifestly disregard case law that established that a carrier cannot be held liable for cargo damaged after it has been delivered to a government-controlled port, where the panel found that a contractual provision deeming the port employees charged with offloading the cargo servants of the carrier sufficiently distinguished those precedents). In *Toys 'R' Us*, the arbitration panel found that, in contrast to the plaintiff in *Kenford I*, who could provide no reasonable basis for predicting the revenues that would have been generated by a concession stand in the never-constructed stadium, the plaintiff in the case before it could accurately gauge lost profits based on a previous record of sales from similar stores. 126 F.3d at 24. Because *Kenford I* establishes a fact-specific inquiry, and because the arbitral tribunal found *Kenford* factually distinguishable, there was no manifest disregard of law. *Id.*

In *Kenford I*, the Court of Appeals concluded, on the basis of the evidence before

---

**10.** Indeed, were we confronted with the task of construing the CSA in the first instance, we might well be inclined to adopt the reading proposed by the district court, for we have serious reservations about the soundness of the arbitrator's reading of this contract. Yet our standard of review constrains us to affirm an arbitrator's judgment even if "a court is convinced he committed serious error." *Pike,* 266 F.3d at 86 (quotation marks omitted).

the Court, that liability for lost profits over the length of the contract was not in the contemplation of the parties. 67 N.Y.2d at 262, 502 N.Y.S.2d 131, 493 N.E.2d 234; *see also Ashland Mgmt. Inc. v. Janien,* 82 N.Y.2d 395, 403, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993) ("The rule that damages must be within the contemplation of the parties is a rule of foreseeability. The party breaching the contract is liable for those risks foreseen or which should have been foreseen at the time the contract was made."). Nothing in either of the *Kenford* cases dictates that the arbitrator was required to conclude, on the basis of the evidence before him, that the parties had contemplated an award of expectancy damages for the breach of Westerbeke's right of first refusal.

Similarly, the CSA is materially different from the contract at issue in *Goodstein.* Even had the City performed under the *Goodstein* contract, there was no guarantee that a contract would have been formed. The plaintiff could not show that the City's breach was the cause of plaintiff's damages. 80 N.Y.2d at 372, 590 N.Y.S.2d 425, 604 N.E.2d 1356. In contrast, Daihatsu was obligated to form a contract for inclusion of the E–070 engine if the condition precedent of agreement on sales terms was objectively met. The arbitrator concluded that the *Goodstein* court's primary concern—that the plaintiff would be able to reap the benefits of a contract that the City was free to reject—was not implicated in the instant case, as Daihatsu's freedom to reject the amendment of the contract was limited by the terms of the CSA. Moreover, the arbitrator found that Daihatsu was the "but-for" cause of Westerbeke's injuries, stating: "[T]he real problem was not a sticking point on specifics, as there was agreement on all of them, but rather was Daihatsu's unwillingness to offer the engine to West-

erbeke absent renunciation of certain of Westerbeke's rights in the CSA. . . ."

Given these distinctions, we cannot say that either the *Kenford* cases or *Goodstein* establish a rule of decision, in a way that is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator," *Merrill Lynch,* 808 F.2d at 933, that expectancy damages were unavailable for a violation of Article 3.2 of the CSA.

### B. Manifest Disregard

██ Even if we were to accept Daihatsu's invitation to conduct a *de novo* analysis of the CSA, and even if we were then to conclude that the CSA is a preliminary agreement, Daihatsu still could not prevail under the second prong of the manifest disregard test. It is not enough that the moving party provide proof that the arbitrator was aware of the governing legal principle; there must also be a showing of intent. *See DiRussa,* 121 F.3d at 821–22 (explaining that the arbitrator must either knowingly "refuse[ ] to apply" or "intentionally disregard[ ]" governing law). A party seeking vacatur must therefore demonstrate that the arbitrator knew of the relevant principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it. *See Merrill Lynch,* 808 F.2d at 933 ("[T]he term 'disregard' implies that the arbitrator appreciates the existence of a clearly governing legal principle but decides to ignore or pay no attention to it.").

██ Explicit rejection of governing law provides the strongest evidentiary basis for a finding that the arbitrator acted with the requisite intent. Hence, this Circuit recently vacated an arbitration award when an arbitrator acknowledged on the record that this Court had previously ruled on the issue in question, but nonetheless

repudiated that precedent. *N.Y. Tele. Co.*, 256 F.3d at 93. The manifest disregard doctrine is not confined to that rare case in which the arbitrator provides us with explicit acknowledgment of wrongful conduct, however. *Halligan*, 148 F.3d at 204 ("[W]e doubt whether even under a strict construction of the meaning of manifest disregard, it is necessary for arbitrators to state that they are deliberately ignoring the law."). A court may find intentional disregard if the reasoning supporting the arbitrator's judgment "strain[s] credulity," *id.*, or does not rise to the standard of "barely colorable," *see Willemijn*, 103 F.3d at 13; *Fahnestock*, 935 F.2d at 516 (confirming award so long as "any colorable justification" supports the decision); *Siegel v. Titan Indus. Corp.*, 779 F.2d 891, 894 (2d Cir.1985) (confirming an arbitration award of damages even though the tribunal did not explain the calculus used to arrive at the damages amount, because the moving party submitted an affidavit explaining how the tribunal may have arrived at its damages award without violating the governing law).

Daihatsu cannot prove that the arbitrator appreciated that the *Goodstein* rule controlled the damages issue and that he nonetheless intended to ignore it. Given the arbitrator's understanding of the nature of the contract, his rationale for taking this case outside the rule established in *Goodstein* is at least slightly colorable, which is all that is required given the strong presumption that the arbitrator has not acted in manifest disregard of the law.

## II.   Additional Grounds for Vacatur

Daihatsu requests that, if we vacate the district court's judgment with respect to the manifest disregard of New York damages law, we remand for the district court to consider in the first instance whether Daihatsu may prevail under three alterna-

tive grounds raised below: (1) the arbitrator acted in manifest disregard of New York's "law of the case" doctrine; (2) the arbitrator exceeded his authority by awarding expectancy damages; or (3) the arbitrator failed to draw from the essence of the agreement. Because these arguments were fully briefed below and on appeal, and because we find them to be without merit, we dispose of them fully on this appeal.

### A.   Manifest Disregard of the "Law of the Case" Doctrine

The "law of the case" doctrine is a rule of practice followed by New York courts that dictates that "a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *In re Korean Air Lines Disaster*, 798 F.Supp. 755, 759 (E.D.N.Y.1992) (quotation marks and citation omitted). The New York Court of Appeals recently elaborated on the application of this doctrine:

> The term "law of the case" is ... used, often in Federal court decisions, to describe the doctrine requiring a lower court, on remand, to follow the mandate of the higher court. In that setting, there is no discretion involved; the lower court must apply the rule laid down by the appellate court. Although we too have employed the term in that way, we now refer to it primarily in the manner raised on this appeal—as a concept regulating pre-judgment rulings made by courts of coordinate jurisdiction in a single litigation.

*People v. Evans*, 94 N.Y.2d 499, 503, 706 N.Y.S.2d 678, 727 N.E.2d 1232 (2000) (citations and footnote omitted).

Daihatsu claims that the arbitrator manifestly disregarded New York's "law of the case" doctrine when he ruled in the Final Award that Article 3.2 was a contract with

condition precedent. Daihatsu contends that the arbitrator essentially abandoned his earlier ruling that Daihatsu breached the CSA by refusing to negotiate for the sale of the E–070 engine. As discussed *supra* at Part I, the arbitrator did not in fact abrogate a previous liability ruling when he held that Article 3.2 was a condition precedent. Assuming that the arbitrator did revisit his liability holding at the Final Award phase of the case, Daihatsu's argument would still fail in a number of respects.

■ First, assuming *arguendo* that the arbitrator was bound to follow this procedural rule, we doubt that an arbitrator's manifest disregard of the "law of the case" doctrine could ever support vacatur of an arbitral judgment. "Law of the case" is a discretionary doctrine. *In re Korean Air Lines Disaster* 798 F.Supp. at 759; *cf. Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power."). The *Evans* court contrasted the law of the case doctrine with res judicata and collateral estoppel: "Whereas the latter concepts are rigid rules of limitation, law of the case is a judicially crafted policy that expresses the practice of courts generally to refuse to reopen what has been decided, and is not a limit to their power. As such, law of the case is necessarily amorphous in that it 'directs a court's discretion,' but does not restrict its authority." *Evans*, 94 N.Y.2d at 503, 706 N.Y.S.2d 678, 727 N.E.2d 1232 (citations omitted); *see also New York v. Palumbo*, 79 A.D.2d 518, 433 N.Y.S.2d 770, 771 (1st Dep't 1980) (holding that " 'law of the case,' as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided,

not a limit on their power," and does not strip courts of their authority to revisit their previous decisions). As a predicate for a finding of manifest disregard, this "amorphous" rule of practice is a far cry from the well-defined substantive legal principles that constitute clearly applicable governing law.

■ Second, the "law of the case" doctrine may be properly invoked only if "the parties had a 'full and fair' opportunity to litigate the initial determination." *People v. Bilsky*, 95 N.Y.2d 172, 175, 712 N.Y.S.2d 84, 734 N.E.2d 341 (2000) (quotation marks omitted). The issue of the type of contract created by Article 3.2 was not "fully and fairly" litigated at the liability stage, where the pleadings and the decision were directed toward another issue entirely—whether the E–070 engine fell within the scope of Article 3.2. Subsequent to the Interlocutory Award, the arbitrator held more than twenty days of hearings and received extensive briefing on the precise issue of the type of contract that was formed, and consequently the types of damages that could be awarded for a breach. The "law of the case" doctrine was therefore inapplicable.

Finally, Daihatsu's only support for its argument that the arbitrator "must" have been aware of New York's "law of the case" doctrine is the arbitrator's statement at the first page of the Final Award that the holding in the Interlocutory Award remains fully binding. That is not sufficient to show that the arbitrator was even aware of the applicability of the "law of the case" doctrine, and certainly is not evidence of willful disregard.

## B. Arbitrator Exceeded His Authority

■ The FAA permits vacatur of an arbitral judgment "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and

definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Daihatsu contends that vacatur is appropriate under this provision because "the Arbitrator exceeded the authority granted to him by the parties in the CSA when he awarded expectancy damages precluded by New York law."

■■■■ "We have consistently accorded the narrowest of readings to the Arbitration Act's authorization to vacate awards [pursuant to § 10(a)(4),] especially where that language has been invoked in the context of arbitrators' alleged failure to correctly decide a question which all concede to have been properly submitted in the first instance." *In re Andros*, 579 F.2d at 703. "Our inquiry under § 10(a)(4) thus focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *DiRussa*, 121 F.3d at 824; *see also In re Fahnestock*, 935 F.2d at 515 ("[W]e have recognized that if arbitrators rule on issues not presented to them by the parties, they have exceeded their authority and the award must be vacated." (quotation marks omitted)).

In *Fahnestock*, this Court considered whether New York's so-called *Garity* rule, which categorically prohibits the imposition of punitive damages by an arbitrator, precluded a punitive damages award under an arbitration agreement that was silent on the punitive damages issue. 935 F.2d at 519. Holding that arbitrators lack the authority to award punitive damages under New York law, we vacated the judgment. *Id; see also Katz v. Feinberg*, 290 F.3d 95, 97–98 (2d Cir.2002) (holding that the arbitration panel exceeded its authority when it revised a valuation issue that had been exclusively committed by the contract to independent accountants).

■■■■ While the arbitrator in *Fahnestock* was not entitled to grant punitive damages, awards of expectancy damages *are* within the broad power given to arbitrators. This case is more akin to the challenge raised in *DiRussa* to an arbitrator's refusal to grant attorney's fees for a violation of the Age Discrimination in Employment Act, notwithstanding the fact that such fees are statutorily required. The *DiRussa* court concluded that "DiRussa's real objection appears to be that the arbitrators committed an obvious legal error," rather than that the arbitrator lacked the authority to reach the attorney's fees issue. 121 F.3d at 824. Similarly, what is contested here is not whether the CSA allowed the arbitrator to award expectancy damages generally, but whether the arbitrator properly awarded these damages in the case at bar. Section 10(a)(4) does not permit vacatur for legal errors. As the parties in this case properly submitted the question of whether expectancy damages could be awarded for a violation of Article 3.2, the award cannot be vacated under § 10(a)(4).

## C. Essence of the Agreement

■■■ Daihatsu further argues that vacatur is justified under § 10(a)(4) on the alternate ground that the arbitrator exceeded his authority by issuing an award that did not draw its essence from the CSA. The "essence of the agreement" doctrine is not derived from the FAA, however, but rather has its origins in *United Steelworkers v. Enterprise Wheel & Car Corp.* 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) ("[A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it

draws its essence from the collective bargaining agreement."). In *Enterprise Wheel*, the Supreme Court set forth the standard of review of an arbitration award issued under a collective bargaining agreement pursuant to § 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185.[11] Section 301, in addition to granting federal courts jurisdiction to enforce arbitration awards issued under collective bargaining agreements, establishes a substantive body of federal law for reviewing arbitral awards that is "analytically distinct from the FAA." *Coca–Cola Bottling Co. v. Soft Drink & Brewery Workers Union Local 812*, 242 F.3d 52, 54 (2d Cir.2001); *cf. Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 455, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (holding that § 301 is a source of substantive federal law). We have traditionally confined the "essence of the agreement" doctrine to review of arbitration awards issued under collective bargaining agreements. *See, e.g., First Nat'l Supermarkets, Inc. v. Retail, Wholesale & Chain Store Food Employees Union Local 338*, 118 F.3d 892, 895–96 (2d Cir.1997); *Local 1199, Drug, Hosp. & Health Care Employees Union v. Brooks Drug Co.*, 956 F.2d 22, 25 (2d Cir.1992); *Hygrade Operators, Inc. v. Local 333, United Marine Div.*, 945 F.2d 18, 22 (2d Cir.1991); *Harry Hoffman Printing, Inc. v. Graphic Communications Int'l Union*, 950 F.2d 95, 98 (2d Cir.1991); *In re Marine Pollution Serv., Inc.*, 857 F.2d 91, 94 (2d Cir.1988).

Although the "essence of the agreement" doctrine is not to be found in the FAA, our Court in *Toys 'R' Us* nonetheless relied on the foregoing case law in applying "a notion of 'manifest disregard' to the terms of the agreement analogous to that

employed in the context of manifest disregard of the law." 126 F.3d at 25; *see also id.* ("We will overturn an award where the arbitrator merely makes the right noises—noises of contract interpretation—while ignoring the clear meaning of contract terms)." (quotation marks omitted). The *Toys 'R' Us* Court apparently did not recognize that the "essence of the agreement" doctrine was a creature of the federal common law developed under § 301, and was unrelated to the grounds for vacating an arbitration award under the FAA. This confusion is unsurprising given that, in past cases arising under § 301, we have considered whether an arbitral award drew its essence from the agreement in conjunction with our separate inquiry into whether the arbitral award should be vacated under § 10 of the FAA, without explicitly distinguishing between these two distinct sources of substantive law. *See, e.g., Local 771, I.A.T.S.E. v. RKO Gen., Inc.*, 546 F.2d 1107, 1113 (2d Cir.1977); *cf. Beth Israel Med. Ctr. v. Local 1199, Int'l Bhd. of Teamsters*, No. 99 Civ. 9828, 2000 WL 1364367, at *3 (S.D.N.Y. Sept.20, 2000) (erroneously citing to § 301 case law in holding that vacatur is appropriate under § 10(a)(4) of the FAA if the award does not draw "its essence from the agreement"); *Sanders v. Gardner*, 7 F.Supp.2d 151, 168–69 (E.D.N.Y.1998) (same). The unfortunate tendency of courts in this Circuit to conflate review of awards under the FAA and under § 301 has been an understandable byproduct of the rule established in *Signal–Stat Corp. v. Local 475, United Electrical, Radio & Mach. Workers*, 235 F.2d 298 (2d Cir.1956), that the provisions of the FAA were also applicable

---

11. Section 301 states, in pertinent part, that "[s]uits for violation of contracts between an employer and a labor organization ... may be brought in any district court of the United

States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185.

to actions arising under § 301. *Coca–Cola*, 242 F.3d at 55.

Recognizing the inherent tension between *Signal–Stat* and intervening Supreme Court decisions such as *Lincoln Mills*, our Court in *Coca–Cola* explicitly overturned *Signal–Stat*. *Coca–Cola*, 242 F.3d at 53–55. *Coca–Cola* clarified that the substantive law fashioned under § 301 is "analytically distinct" from the provisions of the FAA and that it would be error to collapse the analysis under the two statutes. *Id.* at 54. Hence, under the holding in *Coca–Cola*, the FAA is no longer applicable to actions to enforce arbitration awards brought pursuant to § 301 of the LMRA. *Id.* at 53.

It may be necessary for a future panel to decide whether the holding of *Toys 'R' Us* remains good law in light of *Coca–Cola's* disavowal of *Signal–Stat*. Although *Coca–Cola* was primarily concerned with the application of the terms of the FAA to actions arising under § 301, its admonition that courts should not conflate inquiries under the two statutes might well apply to the importation into the commercial arbitration context of a ground for vacatur developed in the § 301 context. We may be especially reluctant to recognize an additional non-statutory ground for vacatur, given that the FAA embodies a strong public policy favoring arbitration as an alternative means of dispute resolution. *See, e.g., Chelsea Square Textiles, Inc. v. Bombay Dyeing and Mfg. Co.*, 189 F.3d 289, 294 (2d Cir.1999).

■■■ We need not decide this question today, however, because, even assuming the applicability of this doctrine, Daihatsu has not met its burden of showing that the arbitral award was issued in manifest disregard of the CSA. Under our heightened standard of deference, vacatur for manifest disregard of a commercial contract is appropriate only if the arbitral award contradicts an express and unambiguous term of the contract or if the award so far departs from the terms of the agreement that it is not even arguably derived from the contract. *Cf. Harry Hoffman Printing*, 950 F.2d at 98 (vacating award under "essence of the agreement" doctrine where arbitrator drew on notions of "due process" rather than on terms of contract); *In re Marine Pollution Serv.*, 857 F.2d at 95 (2d Cir.1988) (vacating award under "essence of the agreement" doctrine that went against express terms of the contract and was based instead on considerations of equity). If the arbitrator has provided even a barely colorable justification for his or her interpretation of the contract, the award must stand.

Daihatsu has not pointed to any express provisions of the CSA that foreclose the result reached by the arbitrator. Daihatsu first claims that the arbitrator relied on his own notions of equity when, contrary to the clear terms of Article 3.2, he held that the first sentence of Article 3.2 [12] granted Westerbeke rights to any engines that were suitable for marinization. The sentence in question is the template for an ambiguously phrased contractual provision, lacking as it is in any clear grammatical structure. The arbitrator cannot be said to have acted in manifest disregard of explicit and unambiguous contractual terms when engaged in his assigned task of making sense of such cryptic language.

Daihatsu next argues that the arbitrator manifestly disregarded the terms of the CSA when he held that Article 3.2 was a contract with condition precedent. In making this determination, the arbitrator relied on the express conditional language

---

**12.** "When DAIHATSU desires to sell in the Territory other water-cooled gasoline engines of fewer than four cylinders for the Products than the Engines [sic]."

of the CSA: "*[I]f* DAIHATSU/NM and WESTERBEKE come to an agreement ..., such engines *shall* be added to ... this agreement." (Emphasis added). Notably, the CSA does not explicitly condition the exercise of Westerbeke's right to first refusal on the successful "negotiation" of the terms of sale. Rather, that right is triggered once the parties "come to an agreement." It was for the arbitrator to decide what this phrase meant. The arbitrator's conclusion that "objective" agreement on terms is all that is required is not contrary to any explicit or unambiguous contractual provision. The arbitrator has therefore advanced an interpretation of this contractual language that is at least barely colorable.

## CONCLUSION

For the foregoing reasons, we reverse the judgment of the district court and remand with instructions for the district court to confirm the arbitration award.