## AFSCME, COUNCIL 4, LOCAL 2663 *v.*
## DEPARTMENT OF CHILDREN AND
## FAMILIES ET AL.
## (AC 33571)

Lavine, Espinosa and West, Js.*

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

Argued December 11, 2012—officially released April 16, 2013

*Thomas P. Clifford III*, assistant attorney general, with whom, on the brief, were *George Jepsen*, attorney general, and *Philip M. Schulz*, assistant attorney general, for the appellants (named defendant et al.).

*J. William Gagne, Jr.*, with whom, on the brief, was *Kimberly A. Cuneo*, for the appellee (plaintiff).

*Opinion*

LAVINE, J. The defendant state of Connecticut office of labor relations, on behalf of the defendant department of children and families (collectively department),[1] appeals from the judgment of the trial court, rendered pursuant to General Statutes § 52-418, vacating the arbitrator's award, in which the arbitrator found just cause for the department to dismiss the grievant, Suzanne Listro, from employment. On appeal, the department claims that the court improperly vacated the arbitrator's award. We agree and, therefore, reverse the judgment of the trial court.

The following procedural history and facts were found by the arbitrator, Susan R. Brown. The plaintiff, AFSCME, Council 4, Local 2663 (union), is the collective bargaining unit for department social workers, and Listro is a member of the bargaining unit. The parties entered into a written collective bargaining agreement (agreement) that was in effect at all times relevant.

In May, 2008, Listro had been employed by the department as a social worker for approximately twelve years. At the time, Listro was contemplating adopting a second child and had obtained a foster home license issued by the department. On May 12, 2008, the department placed a seven month old baby boy (baby) in Listro's care. Listro took a one week leave of absence from employment to get the baby adjusted to her home in Mansfield. According to Listro, at first, the baby was fussy, cried a lot, arched his back and did not sleep well. The baby, however, calmed down and settled into a routine on the third day after Listro had changed his formula and the nipples on his bottle.

Listro returned to work on May 19, 2008, and left the baby and her three year old, adopted son together at a day care center. At the end of her workday, Listro

---

[1] The Connecticut State Board of Mediation and Arbitration was a defendant at trial, but is not a party to this appeal.

got the children and went grocery shopping before returning home. After dinner, she took the children to her bedroom, where she turned on a video for her son to watch while she fed the baby. At approximately 7 p.m., Listro sent her son to his room to get his pajamas and placed the baby on the lower corner of the bed while she changed his diaper. Listro's son returned to the bedroom and sat on the bed, and Listro stepped away from the bed to turn off the television and VCR located on the wall opposite the bed. While she was doing so, she heard a thud. When she turned around, Listro saw the baby lying on the linoleum-tiled floor crying and her son in the middle of the bed. When Listro picked up the baby, he became limp and unresponsive. Listro called 911 for assistance. While she waited for an ambulance, Listro administered rescue breaths to the baby.

The police and ambulance service responded to Listro's home and transported the baby to Windham Hospital. From there, the baby was taken by Life Star helicopter to Connecticut Children's Medical Center in Hartford. The baby was pronounced dead at 10:15 p.m. At 2 a.m., Listro was taken to the state police barracks where she gave a statement concerning the incident. Several weeks later, Wayne Carver, the state medical examiner, issued an autopsy report that concluded that the baby had died as the result of shaken baby syndrome.[2] Listro was arrested on July 16, 2008, and charged with manslaughter in the first degree and risk of injury to a child. Listro was found not guilty of those charges.

The arbitrator also found that immediately after the baby's death, the department assigned the matter to its

---

[2] Carver testified at the arbitration hearing. The arbitrator found that, according to Carver, the physical signs on the baby's body were not consistent with death from a fall, but were consistent with death from shaken baby syndrome. This particularly was true because the retinas of the baby's eyes had hemorrhaged, which is the most indicative symptom of shaken baby syndrome.

special investigation unit to determine whether Listro had "committed abuse and/or *neglect of a child*" and whether she posed a risk to the welfare of children, pursuant to General Statutes § 17a-101g. (Emphasis added.) On or about July 3, 2008, the special investigation report substantiated the charge of abuse and neglect, and Listro was placed on the central registry of people deemed to pose a risk to the safety and well-being of children.

On July 17, 2008, the commissioner of children and families issued a statement stating in part: "Given [Listro's] arrest and the seriousness of the charges, I am seeking her termination." The department opened an investigation to determine whether discipline was warranted in light of the baby's death.[3] The department held a mandatory investigatory interview with Listro on July 23, 2008. On the advice of counsel, Listro declined to answer questions regarding the baby's death. Immediately following the investigatory interview, the department conducted a hearing pursuant to *Cleveland Board of Education* v. *Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) (*Loudermill*).[4] At the *Loudermill* hearing, the department gave Listro notice of potential disciplinary charges and pro-

---

[3] On July 18, 2008, Jeanette Perez, assistant director of human resources, sent Listro a letter that stated in part: "Please be advised that an investigatory meeting has been scheduled for Wednesday, July 23, 2008 . . . . This meeting is to discuss your *serious off duty misconduct* that has lead to your arrest. . . .

"If appropriate, a pre-disciplinary conference will be held immediately following the investigatory meeting. The purpose of the pre-disciplinary meeting will be to give you an opportunity to respond to any charges the Department may deem appropriate. . . .

"The maximum level of discipline for *serious off duty misconduct* being considered is dismissal. Should you decline this opportunity to provide additional information or fail to attend the Investigatory meeting or the [*Loudermill*] hearing if held, disciplinary action will be determined and imposed based on the evidence available to us." (Emphasis added.)

[4] Pursuant to *Cleveland Board of Education* v. *Loudermill*, supra, 470 U.S. 546, "due process entitles [a] tenured public employee to *oral or written notice* of the charges against him, an explanation of the employer's evidence

vided her with an opportunity to respond. Again, on the advice of counsel, Listro did not respond.

On July 25, 2008, the department sent Listro a letter discharging her from employment.[5] The letter stated in

and an opportunity to present his side of the story before being terminated . . . ." (Emphasis in original; internal quotation marks omitted.) *Burton* v. *Mottolese*, 267 Conn. 1, 21, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004).

[5] On July 25, 2008, Heidi McIntosh, deputy commissioner of children and families, sent Listro a letter that stated in part: "This letter is your official notification that you are dismissed from your position as a Children Services Consultant for the Bureau of Adolescent Services of the Department of Children and Families effective immediately upon close of the pre-disciplinary meeting held on July 23, 2008. This action is taken *for just cause and is in compliance with your collective bargaining agreement and Administrative Regulations §§ 5-240-5a and 5-240-8a (b)*. Accordingly, this action is taken immediately due to your *serious misconduct which affects the public, the safety and welfare of our clients*.

"On May 12, [2008], a seven month old baby was placed in your home for Foster Care. On May 19, 2008, the baby died while in your care. On July 16, 2008, you were arrested and charged with Manslaughter—First Degree and Risk of injury to a minor. You were afforded an opportunity to provide your version of events. You declined to proved a statement and/or answer any questions on the matter. During this meeting you were advised that *your actions were deemed detrimental to the best interest of the agency and the state*. You were also advised that the department would make a decision based on the information gathered without the benefit of your input.

"The arrest warrant indicates that you provided a statement reporting that the *child had fallen from the bed when you left him unattended while you ejected a tape from the VCR*. However, the medical examiner has deemed that the injury to the child is not consistent with such a fall. Additionally, the Child Protective Services investigation on this matter has been substantiated. Your name has been placed on the Central Registry, meaning [the department] has deemed that you pose an ongoing risk to children.

"*Your actions represent a violation of State Administrative Regulations § 5-240-1c (4): Offensive or abusive conduct toward the public, co-workers, or inmates, patients or clients of state institutions or facilities; and § 5-240-1c (13): Engaging in any activity which is detrimental to the best interest of the agency or the state*.

"A [*Loudermill*] meeting was conducted immediately following the investigatory meeting. You were afforded an opportunity to provide additional and/or mitigating information and to make statement as to why the agency should not take the action being contemplated. The information provided by your union representatives did not serve to mitigate our decision. As such, we have determined that your continued employment with [the department] represents an unacceptable employment risk. Accordingly, due to the seriousness of these charges you were notified on July 23, 2008, that you were dismissed effective immediately. . . ." (Emphasis added.)

pertinent part: "Your actions represent a violation of State Administrative Regulations § 5-240-1c (4): Offensive or abusive conduct toward the public, co-workers, or inmates, patients or clients of state institutions or facilities; and § 5-240-1c (13): Engaging in any activity which is detrimental to the best interest of the agency or the state."[6]

The union filed a grievance with respect to Listro's discharge. The grievance was denied at step three of the grievance procedure, and the union claimed the matter for binding arbitration pursuant to the agreement. The parties stipulated to the following submission: "Did the [department] have just cause to dismiss . . . Listro? If not, what shall be the remedy consistent with the terms of the collective bargaining agreement?" The arbitration hearing was held on July 26, November 4, and November 19,,2010, and the arbitrator issued her award on December 22, 2010. The arbitrator's award stated in part: "In the totality of circumstances, there is just cause for . . . Listro's separation from her employment at the [d]epartment . . . . The grievance is denied."

The union then filed an application in the Superior Court seeking to vacate the arbitrator's award pursuant to General Statutes § 52-418. In its application, the plaintiff alleged that the award should be vacated because (1) the arbitrator exceeded her powers, or so imperfectly executed them, that a mutual, final and definite award was not made, (2) the arbitrator was guilty of misconduct, and (3) the award is against public policy.[7] The

---

[6] The arbitrator found that at the time of the arbitration hearing, the baby's biological parents had filed a civil action against the department, Listro and several others.

[7] In its application to vacate the award, the plaintiff did not allege that the award did not conform to the submission, as it does in its brief on appeal. We decline to decide issues that were not raised in the trial court. See *Billboards Divinity, LLC* v. *Commissioner of Transportation*, 133 Conn. App. 405, 409–11, 35 A.3d 395 (declining to consider argument on appeal that was not raised before trial court), cert. denied, 304 Conn. 916, 40 A.3d 783 (2012).

department filed a cross application to confirm the award pursuant to General Statutes § 52-417. Following the parties' submission of briefs and oral argument, the court rendered judgment, which in its entirety stated: "The arbitrator exceeded her authority in using negligence as a standard and basis for the award. The charge of negligence was never made by the department at the *Loudermill* hearing or in the termination letter sent to [Listro]. The arbitration award is vacated and the matter referred to the arbitrators for a hearing."[8] The department appealed to this court.

On appeal, the department claims that the court improperly granted the union's application to vacate the arbitration award denying the union's grievance. More specifically, the department claims that the court exceeded its authority in vacating the award. We agree with the department.

The standard of review of arbitration awards is well established. See *Industrial Risk Insurers* v. *Hartford Steam Boiler Inspection & Ins. Co.*, 273 Conn. 86, 92, 868 A.2d 47 (2005). "Judicial review of arbitral decisions is narrowly confined. . . . When the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement. . . . When the scope of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission." (Internal quotation marks omitted.) Id., 92–93.

"Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the

---

[8] The department filed a motion for articulation that was denied by the trial court. The department then filed a motion for review in this court; the motion for review was granted, but the relief requested was denied.

grounds that . . . the interpretation of the agreement by the arbitrators was erroneous. Courts will not review the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved." (Internal quotation marks omitted.) Id., 93.

The parties' submission to the arbitrator contained two questions. In this appeal, we are concerned only with the first, i.e., did the department have just cause to dismiss Listro. The department argues that the submission is unrestricted. We agree, as the first question contains no limitations; in particular, the submission does not exclude negligence as just cause for termination of employment.

When considering an appeal from the trial court's ruling on an arbitration matter, "[o]ur inquiry generally is limited to a determination as to whether the parties have vested the arbitrators with the authority to decide the issue presented or to award the relief conferred." (Internal quotation marks omitted.) *State* v. *Connecticut State Employees Assn., SEIU Local 2001*, 117 Conn. App. 54, 59, 978 A.2d 131 (2009). "In determining whether an arbitrator has exceeded the authority granted under the contract, a court cannot base the decision on whether the court would have ordered the same relief, or whether or not the arbitrator correctly interpreted the contract. The court must instead focus on whether the [arbitrator] had authority to reach a certain issue, not whether the issue was correctly decided. Consequently, as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of authority, the award must be enforced." (Internal quotation marks omitted.) *Teamsters Local Union No. 677* v. *Board of Education*, 122 Conn. App. 617, 623, 998 A.2d 1239 (2010). "In other words, [u]nder an unrestricted submission, the arbitrators' decision is considered final and binding; thus the

courts will not review the evidence considered by the arbitrators nor will they review the award for errors of law or fact." (Internal quotation marks omitted.) *Harty* v. *Cantor Fitzgerald & Co.*, 275 Conn. 72, 80, 881 A.2d 139 (2005).

In this instance, the parties agree that article 16, §§ 1 and 2, of the agreement apply to the submission. Section 1 states in relevant part: "No permanent employee . . . shall be . . . dismissed except for just cause. Just cause may include *but is not necessarily restricted to* incompetency, inefficiency, neglect of duty, misconduct . . . ." (Emphasis added.) "Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . ." (Internal quotation marks omitted.) *Assn. Resources, Inc.* v. *Wall*, 298 Conn. 145, 183, 2 A.3d 873 (2010). Neither party contends that the subject language in § 1 is ambiguous.[9] Although § 1 of article 16 states with particularity four kinds of conduct that may constitute just cause, the language "but is not necessarily restricted to" does not exclude negligent conduct as just cause for dismissal. We therefore conclude that negligence arguably came within the purview of the agreement and was an appropriate term for the arbitrator to use to describe Listro's conduct, which was the basis of her dismissal for just cause.

---

[9] Section 2 of article 16 of the agreement concerns the procedures to be followed if "management" decides to impose a dismissal and provides in relevant part: "Prior to a decision to . . . dismiss an employee, the appointing authority shall provide the employee with oral or written notice. . . . The notice shall include what form of action is being considered, shall contain a concise statement explaining what evidence supports the imposition of the action that is being considered and shall state a specific time and place for a meeting where the employee will be given an opportunity to present his side of the story and reasons why the employee feels that the action being considered should not be taken. . . ."

In her findings, the arbitrator identified the positions of the parties at the time of the arbitration. The department claimed, among other things, that it had the right to discipline its employees for off duty misconduct when there is a nexus to the employee's job, which in this instance is the connection between the misconduct and the department's mission to protect children. The union took the position that the department had failed to show a motive for Listro to cause the baby's death and contended that the inconsistencies between Listro's testimony and the autopsy findings do not necessarily suggest that a crime had been committed, or if a crime had been committed, that Listro was the perpetrator. The union requested that the arbitrator reinstate Listro and make her whole.

The arbitrator stated that, although the circumstances of the case were sad and difficult, it was important to keep in mind that the "horrific" outcome of Listro's venture into foster care, i.e., the baby's death, did not change the basic analysis of just cause. The arbitrator found that the department had failed to prove that Listro had shaken the baby or that no one else could have harmed him. Nonetheless, the arbitrator found a "strong" nexus between the conduct at issue and Listro's employment. The arbitrator found that "[w]hile it is true that the conduct for which . . . Listro was terminated occurred off duty and was not in connection with her then-current assignment,[10] it would be naive in the extreme to say that they are unrelated. [The department] in general, and social workers in particular, are charged with the safety of children in their care; an employee's actions off the job in this regard cannot

---

[10] The arbitrator found that, in 2008, Listro was assigned to the "Mentor Program, a position that consisted of recruiting community volunteers to work as mentors with adolescent girls living in [s]tate facilities, running programs for the mentor and mentees, and consulting with staff and mentors regarding issues raised in the program, among other duties."

be divorced from that responsibility and the public trust necessary to accomplish the [d]epartment's task. Thus, [the department] had every right to investigate this matter and determine whether . . . Listro's employment should be continued in light of the events leading" to the baby's death. The arbitrator stated that the fact that Listro was found not guilty of the criminal charges had no impact on the department's independent decision to terminate her employment as a social worker or on the arbitration.

The arbitrator found that Listro "was negligent in her care of" the baby, as it was "her inattention" that permitted him to fall off her bed, and her lapse in judgment had "unusually serious consequences."[11] The arbitrator found that "[g]iven the totality of the circumstances," although Listro was off duty, her actions "made her unemployable by the government agency responsible for the care and welfare of children." The arbitrator therefore denied the grievance.

In its brief to the trial court, the union claimed that the arbitrator exceeded her authority and the award did not draw its essence from the agreement. The gravamen of the union's argument was that, because the department failed to prove that Listro committed the fatal abuse that killed the baby, it had no just cause to terminate Listro's employment. Moreover, the union argued that the arbitrator went outside the agreement when she found that Listro was dismissed for negligence, a charge that was never made in the *Loudermill* hearing or in the termination letter. The union claimed that the department relied on § 5-240-1c (4) and (13) of the Regulations of Connecticut State Agencies to dismiss Listro and that the arbitrator's finding of negligence invoked a completely different standard from

---

[11] The arbitrator found those consequences to be the death of a child, Listro's arrest and subsequent criminal trial, loss of custody of her son, a pending civil suit and loss of her employment.

that articulated in the termination letter. The union makes similar arguments on appeal.

We disagree that the *Loudermill* hearing and the termination letter sent to Listro required the department to identify negligence as the reason for her dismissal. Section 2 of article 16 of the agreement required the department to explain "what evidence supports the imposition of the action that is being considered . . . ." See footnote 9 of this opinion. The termination letter identifies the conduct on which the department rested its decision to dismiss Listro. Negligence is a legal theory; *Finkle* v. *Carroll*, 134 Conn. App. 278, 284–85, 37 A.3d 851, cert. granted on other grounds, 305 Conn. 907, 44 A.3d 184 (2012); it is not evidence of conduct.

Throughout the proceedings, beginning with the notice of the *Loudermill* hearing, the department informed Listro that the issue was her serious off duty misconduct that led to her arrest. A hearing letter, dated July 18, 2008, stated that the "maximum level of discipline for serious off duty misconduct being considered is dismissal." The termination letter did not put a label on Listro's serious off duty misconduct but clearly identified her behavior and the events that constituted the serious off duty misconduct at issue. See footnote 5 of this opinion.

Moreover, the termination letter referenced and quoted § 5-240-1c (4) and (13) of the Regulations of Connecticut State Agencies. The department letter states: "Your actions represent a violation of State Administrative Regulations § 5-240-1c (4): Offensive or abusive conduct toward the public . . . clients of state institutions or facilities . . . and . . . (13): Engaging in any activity which is detrimental to the best interest of the agency . . . ." The arbitrator found a nexus or direct link between Listro's off duty misconduct and her employment with the department, which is charged

with the welfare of the state's children. See General Statutes § 17a-90 (commissioner shall have general supervision over welfare of children who require care and protection of state).

Whether Listro's behavior in placing the baby on the corner of her bed, turning away from him, and permitting him to fall to the floor, is labeled misconduct or negligence is of no consequence. Section 2 of article 16 of the agreement required the department to identify the evidence on which it relied.

We conclude that the parties' submission to the arbitrator was unrestricted and do not find that the arbitrator was precluded from finding that Listro was negligent, which "arguably is" within the terms of the parties' agreement. See *Teamsters Local Union No. 677* v. *Board of Education,* supra, 122 Conn. App. 623. The court exceeded the standards of review applicable to arbitration awards by finding to the contrary and granting the union's application to vacate.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment confirming the arbitration award.

In this opinion the other judges concurred.