******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROGERS, C. J., dissenting. I agree with the majority that the arbitration award at issue in this case conformed to the unrestricted submission and was consistent with the collective bargaining agreement of the parties, the plaintiff, AFSCME, Council 4, Local 2663 (union), and the defendant Department of Children and Families (department),[1] and that the due process rights of the department's employee, Suzanne Listro, were not violated by lack of notice regarding the basis of her dismissal. I would conclude, nevertheless, that the arbitration award should be vacated pursuant to General Statutes § 52-418 (a) (4) due to the arbitrator's manifest disregard of the law. Specifically, the only medical evidence in the record and the arbitrator's own initial factual finding, in accord with that evidence, established that M, a foster child in Listro's care, had died from shaken baby syndrome. Therefore, the arbitrator's subsequent conclusion to the contrary, that Listro was negligent, causing M's death by allowing him to fall from a bed, was a patently irrational application of basic legal principles as contemplated by the test adopted by this court in *Garrity* v. *McCaskey*, 223 Conn. 1, 8–9, 612 A.2d 742 (1992).[2] Accordingly, I would reverse the judgment of the Appellate Court, which reversed the trial court's judgment and remanded the case to that court with direction to affirm the arbitration award; *AFSCME, Council 4, Local 2663* v. *Dept. of Children & Families*, 142 Conn. App. 1, 14, 62 A.3d 1168 (2013); thereby reinstating the trial court's order vacating the arbitration award and referring the matter back to arbitration for a rehearing.

In its application to vacate the arbitrator's award denying Listro's reinstatement, the union invoked § 52-418 (a) (4), claiming, inter alia, that "[t]he arbitrator [had] exceeded her power[s] or so imperfectly executed them such that a mutual, final and definite award upon the subject matter [submitted to her] was not made." The trial court granted the union's application to vacate after concluding that "[t]he arbitrator exceeded her authority in using negligence as a standard and basis for her award," and it referred the matter back to arbitration for a rehearing.

"In construing § 52-418 (a) (4), we have, as a general matter, looked to a comparison of the award with the submission to determine whether the arbitrators have exceeded their powers. . . . We have also recognized, however, that an arbitrator's egregious misperformance of duty may warrant rejection of the resulting award. . . . [For example] [i]f the memorandum of an arbitrator revealed that he had reached his decision by consulting a [O]uija board, surely it should not suffice that

the award conformed to the submission. . . . Other states have also recognized that an arbitrator's egregious misperformance of duty or patently irrational application of legal principles warrants review and rejection of the resulting award. . . .

"[A]n award that manifests an egregious or patently irrational application of the law is an award that should be set aside pursuant to § 52-418 (a) (4) because the arbitrator has exceeded [his] powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." (Citation omitted; internal quotation marks omitted.) *McCann* v. *Dept. of Environmental Protection*, 288 Conn. 203, 220, 952 A.2d 43 (2008).

In *Garrity* v. *McCaskey*, supra, 223 Conn. 10, this court "adopted the test enunciated by the United States Court of Appeals for the Second Circuit in interpreting the federal equivalent of § 52-418 (a) (4). . . . The test consists of the following three elements, all of which must be satisfied in order for a court to vacate an arbitration award on the ground that the arbitration panel manifestly disregarded the law: (1) the error was obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator; (2) the arbitration panel appreciated the existence of a clearly governing legal principle but decided to ignore it; and (3) the governing law alleged to have been ignored by the arbitration panel is well defined, explicit, and clearly applicable."[3] (Internal quotation marks omitted.) *McCann* v. *Dept. of Environmental Protection*, supra, 288 Conn. 220–21. Pursuant to this test, an arbitration award should be set aside only for blatant and egregious legal error, and not "because of an arguable difference regarding the meaning or applicability of laws urged upon it." (Internal quotation marks omitted.) *Garrity* v. *McCaskey*, supra, 9; see also id., 9–10 (vacation for manifest disregard of law reserved for cases in which arbitrator's determination is " 'totally irrational' " or resulted from " 'failure to exercise honest judgment' ").

Although I recognize that the foregoing standard is a strict one, I believe that the unusually confused arbitration award in this case serves to satisfy it. The arbitrator first rejected, as unproven, the department's charge that Listro intentionally had inflicted fatal injuries on M. The arbitrator then explicitly based her decision to deny reinstatement on a wholly different legal theory— that Listro merely had been negligent by allowing M to fall, but her negligence had disastrous consequences. The basic elements of a negligence claim are long-standing, conclusively established and frequently identified and applied in our jurisprudence. They are: "duty; breach of that duty; causation; and actual injury." *Ruiz* v. *Victory Properties, LLC*, 315 Conn. 320, 328, 107 A.3d 381 (2015). As to the third element, it is beyond

fundamental that a party may not prevail on a negligence theory unless he or she proves that the conduct complained of was both a cause in fact and a proximate cause of the injury at issue, that is, the injury would not have occurred absent the conduct, and the conduct was a substantial factor in producing that injury. Id., 329. Accordingly, the legal principle of proximate causation as an essential element of negligence was well-defined, explicit and clearly applicable to the present case, as the arbitrator herself conceived it.

Having determined that a well-defined, explicit legal principle clearly was applicable to the present case, I turn to the question of whether the arbitrator purposefully disregarded that principle. An arbitrator's manifest disregard of a clearly governing legal principle is established if a party seeking vacatur "demonstrate[s] that the arbitrator knew of the relevant principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Westerbeke Corp.* v. *Daihatsu Motor Co.*, *Ltd.*, 304 F.3d 200, 217 (2d Cir. 2002). Although an arbitrator's "[e]xplicit rejection of governing law provides the strongest evidentiary basis for a finding that the arbitrator acted with the requisite intent"; id.; a reviewing court also "may find intentional disregard if the reasoning supporting the arbitrator's judgment strain[s] credulity . . . or does not rise to the standard of barely colorable . . . ." (Citations omitted; internal quotation marks omitted.) Id., 218. In my view, for the reasons that follow, this aptly describes the reasoning employed by the arbitrator in this case.

To begin, the *only* medical evidence in the record decisively demonstrated that M was a homicide victim who had died from shaken baby syndrome, and that he had *not* died from an accidental fall. Specifically, an autopsy report reflects the state medical examiner's conclusions that M died of blunt traumatic head injury and that he was a victim of a homicide. The arbitrator's decision describes this report, as well as the medical examiner's testimony at the arbitration hearing that "the physical signs found on [M's] body were not consistent with death from a fall but were consistent with death from a condition familiarly known as shaken baby syndrome. This was particularly true because M's retinas had hemorrhaged, the most indicative symptom of the syndrome." Moreover, the arbitrator stated, "[t]he [medical examiner] testified that if M had hit his head, the autopsy should have revealed pooled blood under the scalp," which the autopsy report apparently did not indicate.

After describing this medical evidence, the arbitrator explicitly credited it and further acknowledged that there was *no* conflicting evidence in the record that would support a finding of a different cause of death. In the words of the arbitrator herself, the "record con-

clusively establishes that M was a victim of shaken baby syndrome. The [m]edical [e]xaminer's testimony and the autopsy report were not challenged and the [plaintiff] offered not a scintilla of evidence to suggest an alternative diagnosis."

Thereafter, contrary to the only medical evidence in the record as to the cause of M's death and the arbitrator's own initial factual finding, which was consistent with that evidence, the arbitrator proceeded to find additionally that M had died as a result of a fall. To reconcile her completely inconsistent factual findings as to the critical issue in this case, the arbitrator, presumably a medical layperson, contrived a speculative theory that had no basis in any cited evidence, medical or otherwise. Specifically, the arbitrator speculated that M had been shaken at some unknown time preceding his death, by some other party, and that M's fall from the bed was the "proverbial 'last straw'" that caused his death, even though the only medical evidence that was presented showed that he did *not* die from a fall. Furthermore, the arbitrator surmised, it was Listro's negligence that had allowed that fall and caused M's death.

The arbitrator's wholly speculative theory of the case overtly rests not on any actual evidence in the record, but instead, on a *lack* of evidence to disprove the theory. Thus, according to the arbitrator, because there was "nothing in the record establish[ing] that . . . a fall could not have been the proverbial 'last straw' for earlier traumatic injuries," it was reasonable to conclude that M's death subsequent to an assault ultimately was triggered by the final blow of a fall. Additionally, although the arbitrator acknowledged that there was "no evidence regarding how much time could elapse between a severe shaking and . . . a fall in order for the fall to result in death shortly thereafter," and a "dearth of medical information regarding the timeliness for shaken baby syndrome's impact on a particular child," the arbitrator concluded that in this case, there was some unspecified period of delay separating the fatal assault of M and his resulting death. Finally, although there was no evidence that M had been removed from his biological parents' care for physical abuse or that any question had arisen as to the conduct of his prior foster family, who had returned M to the department's custody approximately one week prior to his death, the arbitrator posited that one of those parties might have been "tied to M's fatal injuries" by shaking him and, thus, leaving him vulnerable to the final blow of a fall.[4] Relying on the foregoing evidentiary voids, the arbitrator then concluded that, although the department had failed to prove its allegations of child abuse, the record undoubtedly demonstrated that Listro was negligent, and that her "moment of negligence had unusually serious consequences, the death of a child."

Although the arbitrator identified negligence as the governing legal theory, she failed to discuss or apply any of the fundamental elements of negligence, in particular proximate cause, to the actual evidence in the record. Most troublingly, she failed to explain how that evidence reasonably could support a finding that M's death was proximately caused by Listro's conduct. The arbitrator's appreciation and disregard of this fundamental requirement is evident from her strained and unconvincing attempt to demonstrate that it had been satisfied, despite the complete lack of evidence that a fall, caused by Listro's lapse in judgment, was a substantial factor in M's death, and the existence of *only* evidence to the contrary, which the arbitrator herself explicitly had credited. For the foregoing reasons, the arbitrator's decision was not "barely colorable"; (internal quotation marks omitted) *Westerbeke Corp.* v. *Daihatsu Motor Co., Ltd.*, supra, 304 F.3d 218; but is more accurately described as " 'totally irrational' "; *Garrity* v. *McCaskey*, supra, 223 Conn. 9; or a " 'failure to exercise honest judgment' "; id., 10; and no more reasonable than one which is the product of consultation with a Ouija board. See *McCann* v. *Dept. of Environmental Protection*, supra, 288 Conn. 220. Consequently, vacatur was warranted. Cf. *Hardy* v. *Walsh Manning Securities, L.L.C.*, 341 F.3d 126, 130–31, 134 (2d Cir. 2003) (vacating decision for manifest disregard of law when arbitrator identified respondeat superior as sole governing principle of liability, although parties had agreed that individual held liable was fellow employee, and not employer, of wrongdoer, which barred recovery under well-defined principles of state law, and "no one point[ed] [court] to any evidence in the record that provide[d] a colorable justification for [the arbitrator's] conclusion").

"[T]he principle of vacating an award because of a manifest disregard of the law is an important safeguard of the integrity of alternat[ive] dispute resolution mechanisms. Judicial approval of arbitration decisions that so egregiously depart from established law that they border on the irrational would undermine society's confidence in the legitimacy of the arbitration process." *Garrity* v. *McCaskey*, supra, 223 Conn. 10. For the reasons explained herein, I would reverse the judgment of the Appellate Court, thereby reinstating the order of the trial court that vacated the arbitration award and remanded the case for a new arbitration hearing.

Accordingly, I respectfully dissent.

[1] See footnote 1 of the majority opinion for a listing of the other defendants in this case.

[2] Although the union's arguments concededly are somewhat disorganized, I disagree that it has not sufficiently raised a claim regarding the manifest disregard of the law aspect of § 52-418 (a) (4). The union argues variously throughout its brief that the arbitrator's decision lacks evidentiary support and is inherently inconsistent with her own findings, that the medical evidence showed that M did not die from a fall and that there was no evidence of negligence, in particular, of the element of proximate cause. Moreover,

the union repeatedly quotes from or references the applicable standard for manifest disregard of the law, as recited hereinafter.

[3] More recent Second Circuit cases clarify that two of the three prongs enumerated in *Garrity*, and Connecticut cases that followed that decision, essentially go to the same point, and thus characterize the inquiry as having only two prongs: "The two-prong test for ascertaining whether an arbitrator has manifestly disregarded the law has both an objective and a subjective component. We first consider whether the governing law alleged to have been ignored by the [arbitrator was] well defined, explicit, and clearly applicable. . . . We then look to the knowledge actually possessed by the arbitrator. The arbitrator must [appreciate] the existence of a clearly governing legal principle but [decide] to ignore or pay no attention to it. . . . Both of these prongs must be met before a court may find that there has been a manifest disregard of law." (Citations omitted; internal quotation marks omitted.) *Westerbeke Corp.* v. *Daihatsu Motor Co.*, *Ltd.*, 304 F.3d 200, 209 (2d Cir. 2002). In regard to the first prong, "[a] legal principle clearly governs the resolution of an issue before the arbitrator if its applicability is obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." (Internal quotation marks omitted.) Id.; see also *D.H. Blair & Co.* v. *Gottdiener*, 462 F.3d 95, 110–11 (2d Cir. 2006) (reciting two-pronged test); *Hardy* v. *Walsh Manning Securities, LLC*, 341 F.3d 126, 129 (2d Cir. 2003) (same).

[4] In support of this rationale, the arbitrator assumed the role of a medical expert, without the benefit of any supporting testimony, by noting the prior foster family's report that M had been " 'inconsolable' " and explaining that "[e]xcessive crying and fussiness is a known symptom of shaken baby syndrome as well as a commonly accepted cause of the perpetration of that syndrome."